**LEGACY HOMES PARTNERSHIP, Respondent, and Charles F. Vatterott & Company, CFV–BD Corporation, CFV Development Company, and Gregory B. Vatterott, Respondents/Cross–Appellants,**

v.

**GENERAL ELECTRIC CAPITAL CORPORATION, Defendant, and Gerald Kerr Homes Corporation, GK–BD Corporation, GK Development Company, and Gerald W. Kerr, Jr., Appellants/Cross–Respondents.**

No. ED 78011.

Missouri Court of Appeals,
Eastern District,
Division Two.

July 17, 2001.

Michael P. Stephens, Clayton, MO, for appellant.

W. Stanley Walch, St. Louis, MO, for respondent.

AHRENS, Presiding Judge.

Gerald Kerr Homes Corporation ("Kerr Homes"), GK–BD Corporation, GK Development Company and Gerald W. Kerr, Jr., (collectively "Kerr Parties") appeal from the judgment of the trial court which awarded damages in the amount of $95,360.40 plus accrued interest to Charles F. Vatterott & Company ("CFV") on the various claims of Charles F. Vatterott and Company, CFV–BD Corporation, CFV Development Company and Gregory B. Vatterott (collectively "Vatterott Parties") and denied Kerr Parties' petition for accounting and motion for appointment of a special master.[1] Vatterott Parties cross-appeal from the judgment of the trial court in favor of Kerr Parties on their claim for damages for breach of fiduciary duty by Kerr Parties.

This case arose from a partnership between CFV and Kerr Homes to build and sell upscale residential homes, and entail-

---

1. Four cases were consolidated for trial.

ing the development of various subdivisions. This partnership was the Legacy Homes partnership ("Partnership"). Matters did not run smoothly for Partnership, or for the affiliated partnerships and joint ventures entered into by the Vatterott Parties and Kerr Parties. The various partnerships were terminated on July 15, 1991, with details of the termination embodied in a Winding Up Agreement entered into on that date. Disputes over payments and obligations incurred during the existence of Partnership led to litigation. Kerr Parties contend that the trial court erred in applying the law to the particular facts of this case and not requiring the Vatterott Parties to perform a proper accounting, thereby denying Kerr Parties of the remedy of accounting. Kerr Parties further contend that the trial court abused its discretion and misapplied the law by failing to appoint a special master as requested by Kerr Parties. Kerr Parties also assert that the trial court's judgment was against the weight of the evidence. Vatterott Parties claim that the trial court erred in concluding that they were not damaged by Kerr Parties' breach of fiduciary duty. We affirm.

In early 1989 Gerald W. Kerr, Jr. ("Mr. Kerr"), former vice-president of residential development for the defunct Liberman Corporation ("Liberman"), met with Gregory B. Vatterott ("Mr.Vatterott"), president of CFV, a Missouri corporation, to discuss the possibility of a joint venture. This venture would involve the building of upscale housing in development projects abandoned in the wake of the failure of Liberman, utilizing skilled personnel who

had worked for Liberman and the resources of CFV.

These meetings led to the formation of a partnership between CFV and Kerr Homes, a Missouri corporation, on February 21, 1989, originally known as the Vatt–Kerr partnership, but later as the Legacy Homes partnership ("Partnership"). This Partnership was embodied in the Partnership Agreement ("Partnership Agreement") signed on that date. Under the terms of the Partnership Agreement, Partnership was a general partnership, with each partner holding a fifty percent interest. Kerr Homes was responsible for the day-to-day operation of Partnership activities, providing home-building expertise and managerial skills. CFV was responsible for all Partnership accounting functions and banking. Mr. Vatterott had insisted that Partnership use CFV's accounting system to account for revenues and expenses for Partnership as a precondition to forming Partnership, as CFV had a computer program, C–Mass, for construction operations. Under the Partnership Agreement, CFV also was to provide much of the initial financial backing for Partnership, up to $240,000 in advances in the first six months. Partnership was originally planned to have a duration of three years. CFV did provide $240,000 in advances in the first six months of the Partnership, and subsequently advanced Partnership substantial additional funds.

Partnership, in its own name and through other entities which the partners established for the purposes of conducting Partnership business, became involved in the development of a number of residential subdivision projects.[2] The partnership

**2.** Partnership had projects at The Enclave at Green Trails ("The Enclave"), Muirfield, Princeton Gate, and Radcliffe Place. Barrington Downs Development Partnership, which consisted of CFV–BD Corporation (a CFV firm) and GK–BD Corporation (A Kerr

Homes company), was developing The Meadowlands at Barrington Downs ("Barrington Downs"). The Legacy Development Partnership, which consisted of CFV Development Corporation (a CFV firm) and GK Development Company (a Kerr Homes entity), was

agreements for these other entities were substantially similar to the Partnership Agreement.

The accounting system used by CFV, and therefore by Partnership, utilized a central disbursing account from which the expenses for the different operating divisions would be paid. The managers of the various divisions used a coding system to identify each particular division to which charges were to be debited. Each division kept separate ledgers to show the revenues produced and expenses incurred by that division. Partnership employees, under the direction of Partnership managerial personnel, handled the coding for Partnership expenses. Invoices for Partnership activities were identified either by subdivision or by subdivision and lot number if the invoice related to a particular lot. The invoices and coding information were then sent to CFV's main office to be inputted into the central disbursing system. CFV generated monthly cash-flow summaries for Partnership.

Partnership originally located its office in the Mega Bank Building in St. Ann, Missouri, sharing the same building with CFV, which had opened a bank account for Partnership business with Mega Bank. In August 1989, Mr. Kerr took over the management of CFV's residential single-family construction business at the request of Mr. Vatterott, and management of these operations were pooled with Partnership and Partnership's affiliates. The purposes of the pooling of management of these various operations were to achieve cost savings and lower operating overhead and to provide the marketing expertise of Partnership's personnel to CFV's residential projects. CFV's residential construction business was separate and distinct from Partnership and Partnership projects and

remained so, though it had two projects in the same subdivisions as Partnership projects. Mr. Kerr's annual salary increased from $125,000 for managing Partnership operations to $175,000 for managing CFV's residential construction business as well. How the operating overhead was to be allocated between the parties following the pooled management of operations between CFV's single-family residential division and Partnership lies at the heart of the dispute between the parties in this case. Around November 1989 the Partnership office was moved from the Mega Bank Building in St. Ann to the Roosevelt Bank building in Chesterfield, which was closer to areas of anticipated development and marketing activity.

Problems began to emerge between the Vatterott and Kerr parties concerning the allocation of overhead from the pooled operations management and the failure of sales and revenue from Partnership projects to match initial projections. CFV advanced money to Partnership beyond the $240,000 called for in Partnership Agreement. The cash-flow summary for Partnership generated by CFV for the period from February 1989 to July 1990 indicates that CFV had advanced $2,905,092 to Partnership, as well as $105,600 in cash advances to Partnership from Kerr Homes. Throughout 1990 problems continued to develop and grow concerning money, payments to Partnership vendors and contractors, and profitability. Several meetings were held between Mr. Vatterott and Mr. Kerr regarding these financial problems, with Mr. Vatterott taking the position that Partnership expenses needed to be cut, that the Partnership would not start any new development projects, and that CFV would not renew the Partnership after it

developing Arbor Oaks as a general partner in the Arbor Oaks Partnerships with McBride & Sons, Inc., and Carlyle Townhomes in a joint venture agreement with McBride & Sons, Inc.

expired. Around September 1990, Mr. Kerr opened a bank account for Partnership at Roosevelt Bank to which he was the only signatory, and without the knowledge or consent of CFV or its officers. Between September 1990 and August 1991, Mr. Kerr deposited funds produced by Partnership's business activities totalling $262,692.23 into this account.

Problems continued into 1991, and early in that year Kerr Homes proposed amending the Partnership Agreement to change the method of allocating Partnership expenses, particularly operating overhead. This proposed change called for expenses involving CFV projects to be "charged pro rata to the overall expenses of the Partnership," with CFV reimbursing Partnership for those expenses. CFV did not agree to this proposed amendment, or apparently to any other proposals by Mr. Kerr or Kerr Homes to alter the method of allocating expenses, and the coding system remained in effect. In March 1991 Mr. Kerr and Mr. Vatterott had a meeting in which Mr. Vatterott stated that he wanted to end Partnership early, citing Kerr Homes' inability or unwillingness to contribute a proportional share of capital needed to continue operations.

In March 1991, Partnership entered into a contract with Mr. and Mrs. Chris Garlich ("Garlichs") for the purchase of a home in Arbor Oaks. According to Mr. Kerr's testimony, he had received a call from Mr. Garlich's employer, the head of a large local insurance brokerage firm, who asked if Partnership could "try to help this guy out, try to get him into a house at a very low price[,]" to induce Garlichs to relocate to St. Louis. Mr. Kerr purportedly discussed the matter with Mr. Vatterott and they "agreed to do something." Mr. Kerr told Garlichs to pick a house, negotiate with the sales agent, sign the contract, and then he would look at what he could do for

Garlichs regarding price. In May 1991 Garlichs made a payment to Partnership of $18,000 and subsequently made an additional payment of $12,000 in July 1991. Mr. Kerr deposited both of these sums into the Roosevelt Bank account rather than with Ticor Title Company, the Partnership escrow agent, as was the normal business practice. At some point thereafter, Mr. Kerr refunded this $30,000 to Garlichs, thereby reducing the ultimate sales proceeds by a like amount. This refund was done as part of an effort to increase sales and to promote relations in the community.

On July 12, 1991, CFV unilaterally terminated all Partnership employees effective as of July 14, 1991, although it continued to provide benefits for some of them. On July 15, 1991, CFV and Kerr Homes entered into a Winding Up Agreement for the early termination of Partnership. Under the terms of the Winding Up Agreement, Partnership split the development projects between the parties, except for one joint venture, and the three lots at The Enclave. CFV received the Arbor Oaks project, which contained the house for which Garlich had a contract. CFV received two of The Enclave lots, and was to receive 50 percent of the net profits from the sale of the Kerr Homes lot at The Enclave. Each party was also to receive all escrows attributable to the projects, which it received under the Winding Up Agreement. CFV additionally was entitled to reimbursement from the construction lender on two projects, General Electric Capital Corporation ("GECC"), for invoices paid by CFV for which CFV had not yet been reimbursed.

Garlichs closed on the residence in the Arbor Oaks subdivision in September 1991, at which point Mr. Vatterott and CFV learned of the Roosevelt Bank account and of the $30,000 rebate which Mr. Kerr had

given to Garlichs, which had been paid out of the Roosevelt Bank account. This caused some problems for CFV at the closing, and resulted in a reworking of the financing for the purchase of the home, and effectively a sale at cost to Garlichs.

There were other problems with payments between Kerr Homes and CFV following the termination of Partnership in July 1991 that were not being made in accordance with the Winding Up Agreement and a subsequent agreement in which CFV had agreed to pay Kerr Homes for closing certain home sales on behalf of CFV. Advances made by both CFV and Mr. Kerr were not repaid by Partnership or either party, as there was no agreement between the parties regarding repayment of advances other than that in the Partnership Agreement, which dealt only with the initial advance of $240,000. As of the time of the termination of Partnership, and even through December 1991, the cashflow summaries for Partnership reflected a large negative cash flow, and consequently there were no Partnership funds to repay advances made by anyone.

On July 23, 1993, CFV filed a petition against GECC relating to loan draws and reimbursements, subsequently amending the petition several times, adding Kerr Homes and GK–BD Corporation as defendants, and adding other parties as plaintiffs. Kerr Homes filed a counterclaim in that action for an accounting against CFV and Mr. Vatterott. Kerr Parties filed a

separate action against the Vatterott Parties on April 10, 1995, and Vatterott Parties counterclaimed for breaches of contracts and assorted torts. The various lawsuits were consolidated into Cause No. 640423.[3]

Kerr Parties and Vatterott Parties both made claims for accounting, and pursuant to the order of the trial court, both sides filed accountings on October 15, 1996 and November 27, 1996 respectively. The Kerr Parties objected to the Vatterott Parties' accounting, but Vatterott Parties did not object to the accounting submitted by Kerr Parties. On January 21, 1997, Kerr Parties filed a motion for appointment of a special master, a certified public accountant, with the trial court to examine the various accounting issues between the parties. The trial court considered the motion, and indicated that if the Vatterott Parties and Kerr Parties could agree on a special master and work out a suitable mechanism for payment of the master, then he would order the appointment of the special master. Kerr Parties found a certified public accountant with Price Waterhouse, but Vatterott Parties did not agree to the selection of that person as the special master. The trial court suggested a retired accountant, Leyton Broughton ("Broughton"), to the parties, but Broughton declined the position. The trial court denied the motion for appointment of a special master, and assigned the equitable

---

3. CFV's suit against GECC was Cause No. 640423. CFV amended its petition on September 3, 1993 and added Kerr Homes and GK–BD Corporation as defendants. CFV amended its petition again on October 12, 1993 and substituted as plaintiff Partnership and Barrington Downs Development Partnership by and through its general partner, CFV. CFV also added CFV Development Company and CFV–BD Corporation as plaintiffs. On March 24, 1995, CFV filed a separate action, Cause No. 674098, on behalf of Partnership as a general partner, against Kerr Homes and Mr. Kerr for an accounting, to which Kerr Homes filed a counterclaim for an accounting against CFV and Mr. Vatterott. On April 10, 1995 Kerr Parties filed a different petition, Cause No. 674780, against Vatterott Parties, to which Vatterott Parties filed counterclaims alleging business-related torts and breaches of contract. These suits and an additional action, Cause No. 687011, were consolidated into Cause No. 640423.

issues in the case to a senior judge, which assignment the trial court later vacated and took back all issues in the case.

The trial court conducted a four-day bench trial from April 13, 1998 to April 16, 1998, and on May 11, 1998, entered a judgment in favor of Vatterott Parties against the Kerr Parties for damages of $66,430.20, and in favor of Kerr Parties against Vatterott Parties for $5,500, plus interest from September 30, 1991 at a rate of nine percent on all awards. Kerr Parties appealed, and on September 7, 1999, this court reversed and remanded the case to the trial court with directions to the trial court to enter findings of fact and conclusions of law on the controverted factual and legal issues, and also reversed the trial court's order granting Vatterott Parties' motion to disburse interpled funds.

On remand Kerr Parties filed motions for change of judge and for the appointment of a special master, both of which the trial court denied. The trial court issued findings of fact and conclusions of law, and entered judgment on March 16, 2000.[4] Both parties filed motions to amend judgment, which motions the trial court granted in part and denied in part, and entered an amended findings of fact, conclusions of law, and judgment on April 26, 2000. Kerr Parties filed another motion to amend

judgment on May 5, 2000.[5] By consent of the parties the trial court vacated the previous judgment and entered its second amended findings of fact, conclusions of law, and judgment on the consolidated causes of action. In Cause No. 640423, the trial court entered judgment in favor of CFV. and against Kerr Homes for $57,860.40, the amount GECC paid to Kerr Homes, plus nine percent interest since September 30, 1991. In Cause No. 674098, the trial court held that the parties had made reasonably complete accountings and therefore the mutual claims for an accounting were moot, and accordingly dismissed, and referred other claims in that action to the adjudication for Cause No. 674680. In Cause 674680, the trial court entered judgment in favor of CFV and against Kerr Homes for its share of the $21,000.00 disbursed from the Roosevelt Bank account opened by Mr. Kerr which was not spent on Partnership business, that is, $10,500.00.[6] Judgment was also entered in that cause in favor of CFV for $27,000.00, its share of money due from The Enclave development project, and in favor of Kerr Homes for $5,500.00 for closing cost not paid by CFV to Kerr Homes. All of those judgments were to include interest at nine percent from September 30, 1991. All other remaining claims in

---

**4.** A copy of the March 16, 2000 judgment was not included in the Joint Legal File in this case. Vatterott Parties filed a motion to amend judgment on March 29, 2000 which stated that the trial court's orders regarding damages conflicted with its findings of fact and conclusions of law in several particulars, and requested that the court amend its judgment to conform with its findings of fact and conclusions of law. Kerr Parties filed a response to this motion, and also filed their own motion to amend judgment

**5.** The trial court concluded, among other things, that GECC's payment to Kerr Homes of $57,860.40 that was owed to Partnership as reimbursement for construction expenses at

the Barrington Downs and Muirfield development projects relieved it of any further obligation to Partnership or CFV, as payment to one general partner is deemed to be payment to Partnership. Kerr Homes, however, owed this money plus interest to CFV as part of the Winding Up Agreement.

**6.** The trial court made a finding of fact that Mr. Kerr controlled the deposits ($262,-692.23) into and disbursements from the Roosevelt Bank account, and that while many of the disbursements were for Partnership-related matters, $21,000 of the deposits that Mr. Kerr disbursed were not spent on Partnership business.

Cause No. 674680 were judged not supported by a preponderance of the evidence and were denied and dismissed. In Cause No. 687011, the trial court entered judgment that the $103,102.63 in interpled funds were the property of the general partners of Partnership, CFV and Kerr Homes, and were to be split equally. Kerr Parties now appeal this judgment, and Vatterott Parties cross-appeal.[7]

We will uphold the judgment of the trial court unless it is not supported by substantial evidence, is against the weight of the evidence, or misstates or misapplies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976).

In their first point on appeal, the Kerr Parties contend that the trial court erred in applying the law by failing to require that the Vatterott Parties prepare and file a proper accounting in this case, purportedly so complex that "it was practically impossible for a judge to determine the issue," thereby depriving Kerr Parties of the remedy of accounting. We disagree.

Four elements are necessary to establish equitable jurisdiction for an accounting: the need for discovery; the complicated nature of the accounts; the existence of a fiduciary or trust relationship; and the inadequacy of legal remedies. *Bossaler v. Red Arrow Corp.,* 897 S.W.2d 629, 630 (Mo.App.1995). The trial court has discretion to determine whether the facts establish equitable jurisdiction, and its exercise of jurisdiction will be overturned only for an abuse thereof. *Ballesteros v. Johnson,* 812 S.W.2d 217, 220 (Mo.App.1991).

In its judgment, the trial court stated that the parties had made their respective accountings, and noted that the accountings were reasonably complete, such that no further purpose would be served by the court performing an accounting or ordering such to be performed, and that "the mutual claims for an accounting are now moot." Considerable financial evidence was presented at trial, both in the form of extensive documentary evidence and oral testimony. Witnesses for the Vatterott Parties included: the president of the Vatterott Company, Mr. Vatterott, who possesses an L.L.M. in taxation; its former chief financial officer, Mark Leifield; its comptroller, John Conley, who kept the books and accounts for Vatterott Company and also for the Legacy Group, at least for a time; and Gary Clark, a certified public accountant whose firm performed annual audits and other accounting services for the Vatterott Parties. Witnesses for the Kerr Parties included: Mr. Kerr, president of Kerr Homes, and Fred Flegal, a certified public accountant. The parties disagreed over the quality and interpretation of financial information provided, with the Kerr Parties contesting much of the Vatterott Parties' financial evidence and testimony. This does not mean that the trial court misapplied the law by determining that it would be moot to order an accounting and by dismissing the claims for accounting, or that the court abused its discretion. The trial court's decision was not clearly contrary to the facts and circumstances before it, or clearly against reason. *Beckman v. Beckman,* 545 S.W.2d 300, 301 (Mo.App.1976). Point denied.

Kerr Parties contend in their second point on appeal that the trial court abused its discretion and misapplied the law by failing to appoint a special master to handle the accounting disputes between the parties as requested by the Kerr Parties in their motion, and instead conditioning the appointment of a special master

7. The two appeals, Appeal No. ED 78011 and Appeal No. ED 78102, were consolidated.

upon the agreement of the parties, who did not reach such an agreement. We disagree.

The appointment of special masters is governed by Rule 68.01 of the Missouri Rules of Civil Procedure. Rule 68.01 states that "each circuit court in which any action is pending *may* appoint a master therein[,]" (emphasis added) but "reference to a master shall be the exception and not the rule." In bench trials "a reference shall be made only upon a showing that some exceptional conditions requires it[,]" though in cases involving matters of account or in which it is difficult to calculate damages, there is no need to show any further exceptional conditions. Rule 68.01(b). The appointment of a special master is discretionary, not compulsory.

The Kerr Parties relied on Rule 68.01 in their motions for appointment for a special master and in its proposed order of reference. None of the cases cited by Kerr Parties on the point on appeal involves the appointment of a special master under Rule 68.01, but rather they involve the appointment of a referee under sections 515.020 to 515.030 RSMo 1994.[8] These statutes have largely, if not completely, been superseded by Rule 68.01.[9] A referee is not identical to a special master, but these cases can be analogized to the issue

of appointing a special master. In several of the cases cited by the Kerr Parties, the appeal involved the trial courts' compulsory reference to a referee in matters where it had appeared to the trial court that a long account would be involved. *See, e.g., Hancock v. State Highway Commission,* 347 Mo. 944, 149 S.W.2d 823 (Mo.1941), *Minter v. Mid–Continent Petroleum Corp.,* 147 S.W.2d 120 (Mo.App.1940), and *Fine Art Pictures Corp. v. Karzin,* 29 S.W.2d 170 (Mo.App.1930). The appellate courts in each of these cases held that the trial court had properly ordered a compulsory reference to a referee even where the court noted that the facts that emerged from the hearing before the referee ultimately showed that the matter was not proper for reference. *Minter,* 147 S.W.2d at 122. In its discretion, the trial court could have appointed a special master to do an accounting. But the issue on appeal is not whether the trial court improperly appointed a special master, rather that it denied Kerr Parties' motion for such an appointment.

Denial of a motion for compulsory reference can constitute reversible error, but "the inescapable import" of Missouri cases on compulsory reference strongly suggest "that a trial court is invested with a considerable measure of discretion in ruling [on] a request for compulsory reference,

---

**8.** All further statutory references are to RSMo 1994 unless otherwise indicated.

**9.** Section 515.020 states that:
Where the parties do not so consent, the court may, upon the application of either, or of its own motion, direct a reference in the following cases:
(1) Where the trial of an issue of fact shall require the examination of a long account on either side, in which case the referees may be directed to hear and decide the whole issue, or to report upon any specific question of fact involved therein; or
(2) Where the taking of an account shall be necessary for the information of the court,

before judgment, or for carrying a judgment or order into effect; or
(3) Where a question of fact other than upon the pleadings shall arise upon motion or otherwise, in any stage of the action.
Section 515.030 states:
In all cases of reference, the parties, except when an infant may be a party, may agree upon a suitable person or persons, not exceeding three; and, upon filing such agreement, the reference shall be ordered accordingly. If the parties do not agree, the court shall appoint one or more referees, not exceeding three, who shall be free from all exception.

...., and that reversible error for refusal to refer may not be found unless the appellate court may declare confidently that such refusal constituted a clear abuse of judicial discretion on the part of the trial court." *Estes v. Francis*, 364 S.W.2d 143, 146 (Mo.App.1963). In *Phillips v. Todd*, 180 S.W. 1039, 1041–1043 (Mo.App.1915), the Court of Appeals merely suggested that the trial court should appoint a referee on remand, but did not direct the court to do so, and reversed and remanded on other grounds. The case before us is a bench trial, not a jury trial. We do not find that the trial court's ruling is arbitrary, unreasonable, or so clearly against the logic of the circumstances as to constitute a clear abuse of judicial discretion. *Estes*, 364 S.W.2d at 146.

To the extent that Rule 68.01 does not supersede sections 515.020 and 515.030, this court also examines Kerr Parties' claim that the trial court's order violated these statutes. Under section 515.020 when the parties do not consent to a reference, the trial court "*may,* upon the application of either [party], or of its own motion, direct a reference" under certain circumstances, which include the need for an examination of a long account or "[w]here the taking of an account shall be necessary for the information of the court ...." (emphasis added). Thus the trial court has discretion to decide if a reference to a referee is necessary, and to order that reference if it so decides, even if none of the parties want a reference. Section 515.030, which the Kerr Parties refer to in their brief but not in their motions for appointment of a special master, states that "In all cases of reference, the parties, ...., may agree upon a suitable person or persons, ....and, upon filing such agreement, the reference shall be ordered accordingly. If the parties do not agree, the court shall appoint one or more referees[.]" Under this section, if the court determines that an issue should be a matter of reference to a special master or referee, then the court has the power to determine who the referee(s) shall be if the parties cannot agree on whom to select. The trial court in this case did not judicially determine that the accounting issues should be a matter of reference, and therefore was not subject to the purportedly mandatory language of section 515.030 to appoint a referee or master upon the failure of the parties to agree upon a suitable person.[10] The trial court did not misapply section 515.030.[11] Point denied.

■ Kerr Parties aver in their third point on appeal that the trial court's judgment concluding that the parties did not have an agreement to allocate operating overhead and that Vatterott Parties corrected any instances of improper allocation

10. In the February 29, 2000 hearing on several motions, Judge Drumm stated "....I told the parties at that time that I would be glad to appoint a master. That I thought a master was appropriate for this case." He added that the parties could not find someone on whom they could agree, and that he made efforts on his own to find a person that the parties could mutually accept that proved to be futile. Although Judge Drumm apparently expressed an opinion that a special master would be useful in the consolidated causes of action, he never directed a reference under section 515.020 that could bring the purportedly mandatory language of section 515.030 into effect.

11. Section 515.030 does not apply to the circumstances of this case. We need not decide, therefore, whether the purported "mandatory" language of Section 515.030 conflicts with Rule 68.01, which deals with the appointment of special masters and gives the trial court discretion to order such an appointment. If there were a conflict between section 515.030 and Rule 68.01, Rule 68.01 would supersede the statutes to the extent that they conflict with the rule. Rule 41.02.

of expenses was against the weight of the evidence.

This court will set aside a judgment in a bench-tried case on the grounds that it is against the weight of the evidence only when we firmly believe that the judgment is wrong. *Murphy v. Carron*, 536 S.W.2d at 32; *In re Turnbough*, 34 S.W.3d 225, 227 (Mo.App.2000). The trial court has had the opportunity to weigh the credibility of the witnesses and to assess the evidence, and to believe or reject any or all of the testimony. As the trier of fact, it is the trial court's function and duty to assess the weight and value of the testimony of each witness. *State ex rel. Dept. of Social Services, Div. of Child Enforcement v. Kobusch*, 908 S.W.2d 383, 384 (Mo.App.1995). This court reviews the evidence in a manner favorable to the judgment, disregarding contradictory evidence, and will defer to the trial court even if the evidence could support another conclusion. *Id.*

The trial court made a conclusion of law that the Partnership Agreement governed the allocation of expenses between CFV projects and Partnership projects, and that the Partnership Agreement stated that CFV was responsible for all accounting functions of the Vatt–Kerr/Legacy partnership. The trial court also concluded that CFV never agreed to changes to the method of allocating operating overhead proposed by the Kerr Parties, and that CFV personnel rectified any instances of incorrect allocation.

In their brief the Kerr Parties contend that Vatterott Parties' witnesses Mark Leifield ("Leifield") and John Conley ("Conley") "admitted that the parties agreed and intended to allocate such operating overhead costs on a closed dollar volume basis," and cite to several locations in the transcript. Only one of these citations actually involves testimony by either Leifield or Conley. Other citations refer to Mr. Vatterott's testimony, and one refers to Mr. Kerr's testimony. Mr. Vatterott specifically stated that the entire deal was predicated on using CFV's accounting system. At other points in his testimony, Mr. Vatterott also stated that there was no agreement made on allocation of operating overhead after the Partnership Agreement, and "[t]he allocation process that we had was we made our own expenses."

The citation to Leifield's testimony addresses what appear to be inconsistencies between Leifield's testimony at trial and his deposition and Kerr Parties' Trial Exhibit 32 regarding the allocation of operating overhead between Partnership and CFV. Leifield had testified on direct examination that none of the Kerr Parties' proposals regarding such allocation was ever implemented, which testimony appeared to be somewhat inconsistent with his deposition and Kerr Parties Trial Exhibit 32, a January 19, 1991 memorandum written by Leifield. Leifield offered explanations for these apparent inconsistencies, which explanations the trial court as the trier of fact could believe or reject in part or in total. The transcript also reflects at several points that Leifield testified that there never was an agreement to use any of the Kerr Parties' proposals on allocation and that Mr. Vatterott never agreed to use the "closed dollar volume" as a basis to allocate overhead expenses.

Conley testified about CFV's accounting system, and the coding of expenses. The record does not indicate that Conley admitted that the Vatterott Parties agreed to allocate operating overhead according to the closed dollar volume basis.

Based on the foregoing, we find that the trial court's judgment is supported by substantial evidence. Point denied.

In its sole point on cross-appeal, Vatterott Parties contend that the trial

court erred in concluding that they were not entitled to recover $30,000 from Kerr Homes for its actions in depositing earnest money in an unauthorized bank account instead of with Ticor Title Company, and thereafter unilaterally returning that earnest money to Mr. and Mrs. Chris Garlich, which actions breached fiduciary duties that Kerr Homes owed to Vatterott Parties as partners. We disagree.

On review of a court-tried case we sustain the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We accept the evidence and inferences favorable to the prevailing party and disregard all contrary evidence. *State ex rel. Dept. of Social Services v. Kobusch*, 908 S.W.2d at 384. We defer to the factual findings of the trial judge, who is in a superior position to assess credibility. *Id.*

The trial court did conclude that Kerr Homes unilateral decision to deposit $30,000 in payments from the Garlichs into the Roosevelt Bank account, and thereafter to return the funds from this account to the Garlichs was a breach of its fiduciary duty to its partner, CFV, under section 358.210. The trial court also concluded that despite the technical breach of fiduciary duty by depositing this $30,000 into and refunding it from a bank account that Kerr Homes was not authorized to open and maintain, that the action of refunding the earnest money to the Garlichs was within the business discretion of Kerr Homes as a partner in Legacy Homes, and caused no damage to CFV. In essence, the trial court concluded that Kerr Homes was conducting partnership business, and made a business decision that was not unreasonable, extraordinary, or beyond its power in electing to sell a home essentially at cost

as a marketing tool. Kerr Homes did not make a profit from these transactions involving the Garlichs. The trial court did not err in concluding that Kerr Homes acted within its business discretion as a partner of Legacy Homes by refunding the $30,000 to the Garlichs, and therefore did not cause damage to CFV. Point denied.

The judgment of the trial court is affirmed.

WILLIAM H. CRANDALL JR., J., concurs.

JAMES R. DOWD, J., concurs.