ARTILLA COVE RESORT, INC., Berton R. Leman and Gwendolyn A. Leman, Husband and Wife, Plaintiffs–Respondents,

v.

Earl D. HARTLEY and Eileen Hartley, Husband and Wife, Defendants–Appellants.

No. 24140.

Missouri Court of Appeals,
Southern District,
Division Two.

April 22, 2002.

Glenn P. Green, Thomas M. Benson, Lowther, Johnson, Joyner, Lowther, Cully & Housley, LLC, Springfield, for appellants.

Daniel R. Wichmer, Lathrop & Gage, L.C., for respondents.

JOHN E. PARRISH, Judge.

Earl D. Hartley and Eileen Hartley (defendants) appeal a judgment in an action for fraudulent misrepresentation brought by Artilla Cove Resort, Inc., Berton R. Leman and Gwendolyn A. Leman (referred to, collectively, as "plaintiffs"). This court affirms.

This case was tried before the court without a jury. Appellate review is undertaken pursuant to Rule 84.13(d). The judgment will be affirmed unless it is not supported by substantial evidence, is against the weight of the evidence or erroneously declares or applies the law. *Parnell v. Sherman*, 899 S.W.2d 900, 901 (Mo. App.1995). This court defers to the trial court's superior ability to judge the credibility of witnesses. *Id.* Evidence and permissible inferences consistent with the findings of the trial court are accepted and contradictory evidence disregarded. *Id.*

In 1995 defendants owned Artilla Cove Resort. The resort is located in Stone County, Missouri, near Table Rock Lake. It consists of ten rental units, a main building, and a commercial dock. The main building includes the resort office and owner's residence. Laundry facilities, a storage area, and two of the rental units are in the basement of the main building.

Mr. and Mrs. Leman were interested in buying a resort. A realtor showed them Artilla Cove Resort. The real estate listing described the resort as in "excellent" condition. Mr. and Mrs. Leman toured the resort. The basement of the main

building was "jam packed full of stuff." The east basement wall was covered with plywood with shelving alongside it. Mr. Leman was asked whether their tour of the basement included going everywhere downstairs or whether they just walked in, looked around, and went back upstairs. He answered:

Pretty much just kind of walked in. The—The downstairs was—was loaded with stuff, junk and storage, and a little of everything, and there was kind of a path through it. We were able to walk through and get a general idea of what was there, but she was—was pretty chock full of stuff so you really couldn't look into every nook and cranny.

The Lemans asked defendants questions about the resort. He explained, "So we kind of relied on—on that [sic] they told us." He continued, "They had—had indicated that the resort was in excellent condition. Had indicated that we wouldn't have to do much more than come in and—and run it. That, you know, everything was up to snuff, up to par. You know, we'd—we'd just have absolutely no problems."

Mr. and Mrs. Leman visited Artilla Cove Resort twice after the realtor showed them the property. They ultimately contracted to buy the resort. The sale was closed November 7, 1995. The real estate on which it was situate was conveyed to Artilla Cove Resort, Inc., a corporation formed by Mr. and Mrs. Leman. The Lemans began operating the resort three days after the closing.

In March 1998, the Lemans decided to tear out the shelving that was along the plywood wall in the basement and have new shelving installed that would be more substantial. Mr. Leman had a contractor come to the resort. Mr. Leman testified:

[W]e asked him to go tear those old things down and put us up a new set of shelves. And upon doing, he started taking the old shelves and cupboards out, got them out of the way, and was looking at how he was going to install the new shelves that we had asked him to put up for us, and he was having a problem figuring out he [sic] could anchor them onto the wall.

The contractor began looking for studding behind the plywood wall to use as anchors for new shelves and cupboards, but could not find any. Mr. Leman told the trial court, "And he would push on the wall and be soft in one area and he's [sic] push on it somewhere else and be hard and he asked me if I knew anything about [sic] and I said I hadn't a clue."

They decided to take some of the plywood wall down to see what was behind it. Mr. Lehman told what they found:

[The wall] had been secured at the top by furring strips nailed to the ceiling, and then furring strips nailed to the floor, approximately three to four inches from the base of the cinderblock [sic] wall. And then the plywood was, in turn, nailed to the top and bottom there, with furring strips between the sheets of plywood to hold them together.

The foundation wall behind the plywood was made of cinder block. It was bulging from the outside into the basement. A door frame that had been installed alongside the plywood wall was adjacent to the protrusion of the foundation wall near the center of the frame, but the base of the door frame was "pushed ... out about four inches or so." There was an area midway along the foundation wall that Mr. Lehman explained was "where the largest area of bulge or collapsing was taking place." It had a quarter inch crack that ran "almost the entire length of the room." The plywood wall had been constructed to look "plumb," although the foundation wall

behind it was bulged and cracked. At one place, the foundation wall was bowed inward up to five and one-half inches. There were other areas of the wall that had cracks horizontally and vertically.

Ben Anderson, an engineer with Scott Consulting Engineers, inspected the wall. He stated that the bow was due to earth pressure. Seven and one-half feet of the eight-foot wall was underground. The wall supported the earth on the outside of the basement, the floor joist, the outside wall that was above ground, and the roof of the building that was built over the basement. Mr. Anderson stated the wall was not structurally sound; that it was in danger of imminent collapse. He recommended a temporary shoring system that plaintiffs' contractor built to prevent further movement until the wall could be replaced.

■ Defendants' first point on appeal is two-fold. It asserts the trial court misapplied the law by applying the wrong burden of proof in evaluating the evidence; that the trial court applied the preponderance of evidence standard of proof but should have required proof by clear and convincing evidence. Point I further asserts the judgment was against the weight of the evidence in that the evidence was not sufficient to prove defendants had knowledge that the basement wall of the main building was defective.

The trial court entered written findings of fact and conclusions of law. Its conclusions of law include the declaration that plaintiffs were required to prove their case by a preponderance of the evidence. Defendants' argue this was error; that *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104 (Mo. banc 1996), requires fraudulent

misrepresentation to be proven by clear and cogent evidence.[1]

The language in *Rodriguez* on which defendants rely states:

The function of the standard of proof is to "allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." *Addington v. Texas*, 441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323, 329 (1979). The clear and convincing standard specifically is used

> in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant. The interests at stake in those cases are deemed to be more substantial than mere loss of money and some jurisdictions accordingly reduce the risk to the defendant of having his reputation tarnished erroneously by increasing the plaintiff's burden of proof.

*Id.* Missouri already requires this higher standard of proof in several types of civil cases. *See [Kansas City v.] Keene [Corp.]*, 855 S.W.2d [360] at 377 [ (Mo.banc 1993) ].

*Id.* at 110.

*Rodriguez* reviewed the purpose of punitive damages and concluded punitive damages were like other issues for which the applicable standard of proof was clear and convincing evidence; that "the remedy [of punitive damages] is so extraordinary or harsh that it should be applied only sparingly." *Id. Rodriguez* held that the clear and convincing evidence standard would thereafter apply in Missouri to common law punitive damages claims. *Id.* at 111.

The same argument that defendants make in this case regarding the applicability of the clear and convincing evidence

1. Although defendants rely on *Rodriguez*, it is not a fraudulent misrepresentation case. *Rodriguez* is a product liability case. The burden of proof issue in *Rodriguez* was directed to the issue of punitive damages.

standard of proof was made in *Brandt Distributing Co., Inc. v. Federal Insurance Co.*, 247 F.3d 822 (8th Cir.2001). *Brandt* was a contract action that sought recovery on a fire insurance policy. The insurer denied coverage on the basis that "(1) Brandt [the insured] concealed or misrepresented its alleged involvement in causing the fire, and (2) Brandt was involved in intentionally causing the fire, either directly or indirectly." *Id.* at 823. The trial court instructed the jury that the burden of proof for the insurer's affirmative defense of arson was the "greater weight of the evidence" rather than a "clear and convincing" standard. *Id.* at 824. On appeal, Brandt contended this was error; that because of the language in *Rodriguez* Missouri law, the law applicable in the case, required a clear and convincing evidence standard in order to support a defense of arson.

*Brandt* summarized the burden of proof as follows:

> In Missouri, it is well established that the burden of proof of an insurer is to prove its allegations of arson as a defense to coverage by a preponderance of the evidence. *McCreery v. Continental Ins. Co.*, 788 S.W.2d 307, 310 (Mo.App. 1990). Nonetheless, Brandt argues that *Rodriguez* changed the law and that the burden should be greater because the interests at stake reflect more than the loss of money, specifically the defendant's reputation. Brandt argues that the case at bar is the first one to address this issue since *Rodriguez*.

*Id.*

*Brandt* reviewed the question that had been presented in *Rodriguez* and discussed the language the Supreme Court of Missouri used in its opinion, including its reliance on and quotation from *Addington v. Texas, supra.* *Brandt* concluded:

> In *Rodriguez*, the Missouri Supreme Court explained that punitive damages "are imposed for the purpose of punishment and deterrence." *Rodriguez*, 936 S.W.2d at 110. Thus, punitive damages are like other cases requiring the clear and convincing standard of proof: the remedy is so extraordinary or harsh that it should be applied only sparingly.
>
> Missouri courts have given no indication that *Rodriguez* applies to any claim other than one for punitive damages. The preponderance of evidence instruction in Missouri, MAI 3.01, has not changed after *Rodriguez*, except with regard to claims of punitive damages. MAI 3.01, Notes on Use.

247 F.3d at 825.

This court agrees with the conclusion the Eighth Circuit reached in *Brandt*. *Rodriguez* changed only the burden of proof requirement with respect to claims of punitive damages. The burden of proof requirements for other claims have not changed. Defendants' argument that the wrong standard of proof was applied in this case is without merit.

■ The remaining claim of error in Point I and the claims of error in Points II and III are claims that the evidence was not sufficient to prove three of the elements of fraudulent misrepresentation: (1) that defendants had knowledge of the falsity of their statement concerning the condition of the property (Point I), (2) that defendants intended for Mr. and Mrs. Lehman to rely on their statements, i.e., that defendants had a duty to disclose the information claimed to have been false (Point II), and (3) that Mr. and Mrs. Lehman had a right to rely on defendants' statements (Point III).

The elements of a claim of fraudulent misrepresentation are: (1) a false, material representation; (2) the speaker's knowledge of its falsity or his ignorance

of the truth; (3) the speaker's intent that it should be acted upon by the hearer in the manner reasonably contemplated; (4) the hearer's ignorance of the falsity of the representation; (5) the hearer's reliance on its truth; (6) the hearer's right to rely thereon; and (7) the hearer's consequent and proximately caused injury. *Dierker Associates v. Gillis,* 859 S.W.2d 737, 746–47[22] (Mo. App. E.D.1993). A failure to establish any one of these elements with substantial evidence is fatal to recovery. *Scott [v. Car City Motor Co., Inc.],* 847 S.W.2d [861] at 864 [ (Mo.App.1992) ].

*Thoroughbred Ford, Inc. v. Ford Motor Co.,* 908 S.W.2d 719, 731 (Mo.App.1995).

### Defendants' Knowledge that their Representation was False

■ One of the witnesses for plaintiffs was Steve Welko. He is a general contractor. Defendants hired him in 1983 to do construction work at Artilla Cove Resort. He constructed the plywood front on the interior of the east basement wall—the wall that Mr. and Mrs. Leman discovered to be cracked, bowing, and in a state of collapsing. Mr. Welko testified that in 1983, when he bid on constructing the plywood front on the wall, the wall was "bowed in" and had cracks. He explained by "bowed in," he meant the wall "had gone out of plumb"; it was "like in a V." Mr. Welko called this to the attention of Mr. Hartley. Mr. Welko expressed concern about further movement of the wall. Mr. Hartley, nevertheless, had him construct the plywood wall. He explained how the plywood wall was constructed:

We would have nailed a two-by-two down on the floor that was in—further into the room from the intersection of where the foundation wall met the floor so that we could build our wall plumb. We'd have to build it in closer than the bow—you know, further into [sic] get past the bow.

Mr. Welko was asked the following questions and gave the following answers:

Q. For lack of a better word, you were plumbing the wall off of the bow?

A. Yes.

Q. So that instead of being flush at the—at the junction of the floor and wall, you have to put the furring strips farther out?

A. That's correct.

Q. And you had to attach—Where'd you attach this floor—or this wall at?

A. We attached it to the concrete floor, and into the floor joist up above.

Mr. Welko said Mr. Hartley told him he was aware of the bow in the basement wall and the cracking; that he had attempted to repair what he believed was causing it. Mr. Hartley was not surprised that the wall was in the bowed and cracked condition at the time he hired Mr. Welko to construct the plywood wall on its interior.

Mr. Welko's testimony provided sufficient evidence for the trial court to find defendants were aware of the condition of the foundation wall when they sold the resort to plaintiffs. Defendants' argument that there was other evidence that demonstrated they did not know of the condition of the wall is of no consequence. " 'On appeal, in considering the sufficiency of the evidence, this court accepts as true the evidence and permissible inferences favorable to the judgment and disregards contradictory evidence.' *Luna v. Smith,* 861 S.W.2d 775, 780 (Mo.App.1993). Questions as to the weight of the evidence are not subject to appellate review. *Nash v. Ozark Barbeque, Inc.,* 901 S.W.2d 353, 357 (Mo.App.1995)." *Anderson v. Howald,* 910 S.W.2d 378, 380 (Mo.App.1995). Point I is denied.

### Defendants' Duty to Disclose

Point II argues that because their relationship with Mr. and Mrs. Leman was not one "of confidence and trust," defendants had no duty of disclosure. They argue the evidence was not sufficient to prove they possessed superior knowledge regarding any material defect in the basement wall that "was not within the fair and reasonable reach of the Lemans."

■■■ As discussed with respect to Point I, the evidence supports the finding that defendants knew the basement wall was cracked and bowed. They constructed a cosmetic plywood wall in front of the damaged foundation wall that concealed the defects. The plywood wall was floor to ceiling. It hid the bowing of the foundation wall and the cracks in that wall. The trial court found that commonly accepted inspection practices employed in checking the condition of property being purchased would not include removal of such a plywood wall; that defendants had superior knowledge of the wall's defect.

An affirmative representation is not necessarily required for actionable fraud to exist. *Murray v. Crank,* 945 S.W.2d 28, 31 (Mo.App. E.D.1997). Silence or concealment of facts can amount to misrepresentation and serve as a substitute element for a false and fraudulent misrepresentation if the silent party has a duty to speak. *Id.; VanBooven v. Smull,* 938 S.W.2d 324, 328 (Mo.App. W.D. 1997); *Ringstreet Northcrest, Inc. v. Bisanz,* 890 S.W.2d 713, 720 (Mo.App. W.D.1995). The duty to disclose information arises either from a classic fiduciary relationship or where one party has superior information not reasonably available to the other party. *Murray,* 945 S.W.2d at 31; *VanBooven,* 938 S.W.2d at 328; *Ringstreet Northcrest,* 890 S.W.2d at 720.

*Keefhaver v. Kimbrell,* 58 S.W.3d 54, 59 (Mo.App.2001).

Mr. and Mrs. Leman were not in an equal bargaining position with defendants. The Lemans asked defendants what the condition of the resort was. They asked if there were any problems with the resort that they had not come across on their walk-through inspection. Defendants told the Lemans the resort was in excellent condition. Defendants had a duty to disclose because they had superior information not reasonably available to Mr. and Mrs. Leman. *Keefhaver, supra.*

Defendants further argue, however, that the language of their sales contract absolved them of responsibility for any failure to disclose. The provision of the contract on which defendants rely states, "BUYER acknowledges that neither SELLER nor any party or [sic] SELLER'S behalf has made, nor do they hereby make, any representations as to the past, present or future condition, income, expenses, operation or any other matter or thing affecting or relating to the Property except as expressly set forth in this Contract." Defendants cite *Ringstreet Northcrest, Inc. v. Bisanz, supra,* in support of their argument.

*Ringstreet* involved the sale of a 153–unit apartment complex. The sales contract provided that the seller was not going to make warranties, representations, or statements as to the physical condition of the property. The parties characterized the transaction as an "as is" sale. 890 S.W.2d at 723. An inspection was made of the property at which time the seller was asked if there had been problems with pipes freezing and bursting in the apartments. The seller said there had been one instance. Damage occurred after the sale closed as a result of pipes freezing and bursting. *Ringstreet* sought damages for fraud alleging that the sellers "knew or

should have known of the problem with the pipes in the apartment complex freezing on a regular basis in cold weather, that [the sellers] failed to disclose this condition prior to the sale, that [the buyer] inspected the Property prior to the sale, that the defect could not be discovered through ordinary inspection, that the defect was material to the purchase, and that [the sellers'] actions in failing to reveal the condition were the direct and proximate cause of [the buyer's] damages." *Id.* at 714–15. The trial court in *Ringstreet* entered summary judgment for the seller. The Eastern District of this court affirmed concluding:

> The real estate contract clearly states that [the buyer] agrees that "it relies upon no warranties, representations or statements" by [the sellers] in purchasing the Property. Furthermore, [the buyer] was allowed to conduct a thorough inspection of the Property and examine documents relating to the Property. Given the particular provisions of the real estate contract here, and especially if, as the record indicates, [the buyer] was told prior to purchasing the Property that there had been one instance of pipes freezing, [the buyer] should have investigated the potential problem further. [Sellers] did not have a duty to disclose the problem, and thus [the buyer's] fraud claim must fail as a matter of law.

*Id.* at 724–25.

The facts in *Ringstreet* are dissimilar to those in this case. In *Ringstreet* the buyer was given notice, upon inquiry, that pipes had frozen in the past. Here, upon inquiry, no information was provided about the cracking and bowing of the wall that was hidden by the cosmetic plywood wall. To the contrary, the Lemans were told the resort was in excellent condition. Further, the representations clause in the "as is"

contract in *Ringstreet* was explicit in that its buyer agreed it was relying upon no warranties, representations, or statements of the seller. There was evidence in *Ringstreet* that access to inspect the plumbing that produced the problem about which the buyer complained had been available. In this case, the trial court found, and the evidence supported the finding, that access to inspect the cracked and bowing foundation wall was not available absent structurally removing the cosmetic plywood wall that covered it.

Defendants had superior knowledge regarding the defect in the basement wall. They withheld that information when the Lemans inquired about the condition of the property. The sales contract did not relieve defendants of the duty to disclose the condition of the foundation wall to the main building. That information was not otherwise within the fair and reasonable reach of the Lemans. Point II is denied.

### *Right to Rely*

■ Point III argues the trial court erred in finding the Lemans had a right to rely on defendants' silence with respect to the condition of the basement wall; that the trial court misapplied or misdeclared the law in that "a party who undertakes his own investigation is not allowed to rely on the misrepresentations of another." Defendants argue "there is insufficient evidence in the record to find that Lemans made only a partial investigation, that the condition of the basement wall was peculiarly within the knowledge of [defendants] or that [defendants] made a specific and distinct representation regarding the physical condition of the basement wall."

In *Consumers Cooperative Association v. McMahan,* 393 S.W.2d 552, 556[6] (Mo.1965), our Supreme Court stated that "where a party makes his own independent investigation, he will

be presumed to have been guided by what he learned and the conclusions he reached and will not be permitted to say that he relied on misrepresentations of another and that he was deceived thereby."

However, we have recognized three exceptions to the general rule enunciated in *Consumers Cooperative Association. Iota Management Corp. v. Boulevard Inv. Co.,* 731 S.W.2d 399, 413 [10, 11] (Mo.App.1987). First, if the party making the independent inspection makes only a partial inspection and relies on the misrepresentations as well as the inspection, he may maintain an action for fraud. *Second, the buyer is entitled to rely on the representation when he lacks equal footing for learning the truth where the facts are peculiarly within the knowledge of the party making the representation and are difficult to ascertain.* Third, even if the parties stand on equal footing, if the seller makes a distinct and specific representation, the buyer has the right to rely on the representation. [Emphasis added.]

*Brennan v. Molina,* 934 S.W.2d 631, 635 (Mo.App.1996). *See also Cotner v. Blinne,* 623 S.W.2d 615, 619 (Mo.App.1981).

The trial court found the evidence in this case supported the second exception stating:

This case involves an exception to the general rule regarding a party conducting its own investigation. Based upon the representations by the defendants made both personally and through the listing and realtor, the plaintiffs were lead [sic] to believe that no further inspection would be necessary. The statements were further supported by the appearance of the wall. Commonly accepted inspection practice would not have required the plaintiffs to remove the plywood wall concealing the defects.

This, coupled with the superior knowledge of the defendants, placed the plaintiffs in an unequal bargaining position.

The trial court's conclusion with respect to plaintiffs' right to rely on the representations made was not an erroneous declaration of law nor was it an erroneous application of law. Its finding was supported by substantial evidence and was not against the weight of the evidence. Point III is denied.

### Damages

■ Point IV is directed to the amount of the judgment entered against defendants. The trial court entered judgment of $123,500. Defendants argue this was error; that the trial court awarded damages on the basis of replacement costs rather than diminution of value; that the trial court misapplied or misdirected the law.

The trial court found, "The measure of damages in this case is the difference in value between the property as represented on the date of sale and its actual value on that date. The court has found this difference to be $123,500."

■ Plaintiffs relied on testimony of Rick Muenks with respect to damages. Mr. Muenks owns and operates a commercial valuation company, Southwest Valuation LLC. He testified the fair market value of Artilla Cove Resort without structural impairment would be $635,000. His opinion was that its value with the structural impairment was $511,500.

In Missouri, a victim of fraud has two options—he can return what he purchased and get his money back (recision), or keep what he purchased and sue for damages measured as the difference between its value as represented and its true value as of the date of purchase (benefit of the bargain). *Heberer v. Shell Oil Co.,* 744 S.W.2d 441, 443 (Mo.banc 1988); *Rosenblum v.*

*Jacks or Better of America West,* 745 S.W.2d 754, 764 (Mo.App.1988).

*Harris v. Union Electric Co.,* 766 S.W.2d 80, 86 (Mo.banc), *cert. denied,* 492 U.S. 919, 109 S.Ct. 3245, 106 L.Ed.2d 592 (1989). When the benefit of the bargain is sought, "a defrauded party is to be awarded the difference between the actual value of the property and what its value would have been if it had been as represented." *Thoroughbred Ford, Inc. v. Ford Motor Co., supra,* at 735.

■ "As the trier of fact, it is the trial court's function and duty to assess the weight and value of the testimony of each witness." *Legacy Homes Partnership v. General Elec. Capital Corp.,* 50 S.W.3d 346, 356 (Mo.App.2001). Real estate values and, hence, under the facts of this case, the calculation of damages based on those valuations are for resolution by the fact finder. *Hawkins v. Foster,* 897 S.W.2d 80, 87 (Mo.App.1995).

■ An appellate court interferes with the assessment of damages only when the damages awarded are so excessive that the conscience of the court is shocked and the appellate court is convinced the fact finder abused its discretion in determining that amount. *Foster v. Catalina Industries, Inc.,* 55 S.W.3d 385, 392 (Mo.App.2001). There was evidence that supported the amount of damages awarded in this case. This court is neither shocked by the amount of damages awarded nor convinced that the trial court abused its discretion in awarding damages. The trial court neither misapplied nor misdeclared the law. Point IV is denied. The judgment is affirmed.

PREWITT and RAHMEYER, JJ., concur.