STATE of Missouri, Respondent,

v.

Christy L. JACO, Appellant.

No. SC 85594.

Supreme Court of Missouri,
En Banc.

Jan. 11, 2005.

As Modified on Denial of Rehearing
March 1, 2005.

Terry J. Flanagan, John W. Peel, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. General, Breck K. Burgess, Assistant Atty. General, Jefferson City, for respondent.

STEPHEN N. LIMBAUGH, JR., Judge.

A jury convicted Christy L. Jaco of abuse of a child for causing the death of her thirteen-month-old child in violation of section 568.060, RSMo 2000. Pursuant to section 557.036, RSMo Supp.2003, the court bifurcated Jaco's trial. After the jury was unable to agree on the appropriate sentence during the penalty phase, the trial court sentenced Jaco to twenty years in prison. Because Jaco challenges the validity of section 557.036, this Court has exclusive appellate jurisdiction. Mo. Const. art. V, sec. 3. The judgment is affirmed.

## I. Facts

The facts, which this Court reviews in the light most favorable to the verdict, *State v. Christeson*, 50 S.W.3d 251, 257 (Mo. banc 2001), are as follows:

The victim was born on October 1, 2000, to Jaco and Jeremy Brooks. Shortly after the child was born, Jaco's friends and acquaintances began noticing that the child suffered from numerous bruises. They observed that her child continued to incur bruises even after Jaco discontinued her relationship with Brooks and moved into an apartment with her new boyfriend, Matthew Eckhoff, and his two children in July of 2001. They also testified that Jaco "slapped" and "shook" her child when she became upset with him.

The acts that led to the child's death occurred on November 21, 2001. About 9:50 p.m., Eckhoff was cleaning the kitchen of the apartment, Jaco was getting ready for work, and the child, who was on the couch in the living room and had been suffering from bronchitis, became fussy and started crying. Eckhoff looked into the living room area from the kitchen and saw Jaco standing between the couch and the coffee table. He saw her lift up the child by placing her hands under his armpits and shake the child so violently that "his head rocked back about five or six times." Jaco then took the child to his bedroom, and Eckhoff heard "three pounds" against the bedroom wall. She then came out of the bedroom, closed the door nearly all the way, and told Eckhoff that the child was finally asleep. At that point, Eckhoff heard no other sounds coming from the child's room.

Around 10:15 or 10:20 p.m., Jaco left for work, and Eckhoff, who thought that the child was sleeping, laid down on the couch and began reading. Sometime between 11:30 p.m. and 12:30 a.m., Eckhoff heard the child coughing and got up to check on

him. Upon discovering that the child was not breathing, Eckhoff performed mouth-to-mouth resuscitation and then called Jaco and 911. An ambulance soon arrived and transported the child to a local hospital, but he was later transferred to Cardinal Glennon Children's Hospital in St. Louis.

By that time, he was in a coma. A CAT scan revealed that the child had sustained serious brain injuries, which were consistent with being severely shaken. Other injuries included: blood in the back of his neck, which was consistent with a whiplash injury; two large bruises to his scalp; a bruise to his left cheek; marks, scrapes, and abrasions to the back of his head; a brown bruise under his left eye; a bruise to his left jaw; two parallel red lines on the back of his head; a red abrasion on his scalp; a mark with a circular pattern of little dots around the outside of it on his forehead; bruises on his thighs; an old injury to his penis; a fractured left clavicle, which was "between one week [and] one month old" and was also consistent with being severely shaken; a fractured right tibia, which was "between two weeks and two months old" and was consistent with an injury caused by twisting the child's ankle; and a red mark on the palm of his left hand. On November 23, 2001, the child was declared legally dead. An autopsy revealed that he died of a closed head injury.

## II. Photograph Exhibit

■ Jaco first alleges that the trial court erred in refusing to admit a photograph, which she claims was the only photograph tendered by either party that accurately demonstrated Eckhoff's vantage point from the kitchen while he watched the shaking incident in the living room.

At trial, the state presented several photographs of the apartment, taken shortly after the offense, purporting to show that Eckhoff would have had a clear view of Jaco shaking the child from Eckhoff's location in the kitchen. Thereafter, during the testimony of Jaco's father, Jaco offered into evidence Defense Exhibit J, the photograph in question, which was taken in the living room after Jaco and Eckhoff had vacated the premises and about a year and a half after the offense. The prosecutor objected to the photograph on the grounds that it was not an accurate representation of the apartment at the time of the offense and that the apartment now had different furniture that made the photograph confusing. In a conference out of the hearing of the jury, Jaco's counsel admitted that the furniture in the apartment had been changed by a different tenant, but argued that the photograph was still admissible because the walls and layout of the apartment had not changed. The trial court sustained the objection, finding the photograph inadmissible because the different furnishings threw everything "out of kilter" so that the photograph was "misleading."

■ Photographs are admissible if they accurately and fairly represent what they purport to depict and tend to prove or disprove any elements of the charged offense. *State v. Middleton*, 995 S.W.2d 443, 462 (Mo. banc 1999). They must show relevant facts that will aid the jury. *State v. Stephens*, 708 S.W.2d 345, 350 (Mo.App. 1986); *State v. Shipman*, 568 S.W.2d 947, 954 (Mo.App.1978). In general, differences in the conditions of the subject depicted between those conditions existing at the time of the crime and those at the time the photograph was taken go to the weight of the evidence, not admissibility. *Id.* However, photographs in which the different conditions are confusing or misleading should be rejected. *See, e.g., Jordan v. Abernathy*, 845 S.W.2d 86, 88 (Mo.App.

1993); *Bellistri v. City of St. Louis*, 671 S.W.2d 405, 407 (Mo.App.1984). Ultimately, the determination of the admissibility of photographs lies in the sound discretion of the trial court. *State v. Ervin*, 979 S.W.2d 149, 161 (Mo. banc 1998).

On the record before us, it cannot be said that the trial court abused its discretion in refusing to admit Defense Exhibit J. It is difficult to determine from the photograph where Jaco was standing when she shook the child, and that difficulty is due in large part to the fact that the furniture used by Eckhoff to describe where Jaco was standing is not shown. As a result, the photograph would have provided neither the judge nor the jury a frame of reference from which they could have determined whether the photograph fairly and accurately demonstrated the line of sight between the kitchen and the precise point in the living room where the incident occurred. Even though changes in the condition of the scene depicted generally go to the weight of the evidence rather than admissibility, the trial court was well within its discretion in determining that the changes or discrepancies here would confuse and mislead the jury rather than aid the jury. The point is denied.

### III. Profile Evidence

■ Jaco next alleges that the trial court abused its discretion by refusing to allow her counsel to cross-examine Dr. Martin Keller, a doctor who treated the victim, and Dr. Jane Turner, a doctor who conducted the autopsy, about profile evidence—scientific studies and statistics concerning the propensities of different types of persons to abuse children.

According to Jaco's offer of proof, Dr. Turner, drawing on her experience and review of certain studies published in authoritative treatises, journals and periodicals, would have testified:

a) That children living in households with one or more male adults not related to them are at an increased risk for maltreatment, injury or death. Moreover, that these same children were subjected to abuse or even death as a result of shaking or blunt trauma.

b) That scientific studies demonstrate that children living in households with adult men unrelated to them are eight (8) times more likely to die of abuse than children living with one or both biological parents.

c) That most perpetrators of shaking and/or blunt trauma to children are unrelated males.

d) That [a] risk factor for infant children being abused is where the child is living with a stepfather or the mother's boyfriend.

e) That scientific studies have established that a common accidental injury explanation/defense offered by perpetrators is that the baby was in some form of distress, choking or not breathing and the perpetrator mildly shook the baby in a vain error to revive the baby.

■■ Expert testimony relating to profile evidence is admissible in the discretion of the trial court to describe behaviors and characteristics commonly observed in victims, *e.g.*, *State v. Silvey*, 894 S.W.2d 662, 671 (Mo. banc 1995) (expert testified that he had observed several behavioral indicators in victim that were consistent with sexual abuse), or to determine the cause of an injury to a victim, *e.g.*, *State v. Candela*, 929 S.W.2d 852, 865–66 (Mo.App.1996) (expert testified that victim suffered from shaken baby syndrome). However, profile evidence is not admissible to show a defendant's responsibility for injury to a victim. *See id.* at 866. This victim/defendant dis-

tinction is necessary to accommodate the general rule that while an expert may express an opinion regarding an ultimate issue in a case, the expert may not express an opinion on the guilt or innocence of the defendant. *State v. Taylor,* 663 S.W.2d 235, 239 (Mo. banc 1984). To do so, of course, would be to invade the province of the jury. *Id.*

In acknowledgement of this rule, Jaco claims that the profile evidence here "would not result or include any question that constituted an opinion of [her] guilt or innocence [and that] the evidence offered did not involve expert testimony involving any claim that [she] or Mr. Eckhoff was responsible for the injuries in question or not responsible." However, the evidence does just that. The clear inference is that an unrelated male who lived with the child, such as Eckhoff, was statistically more likely to have been responsible for the child's injuries than a related female, such as Jaco. This is indeed a comment that Eckhoff is more likely to be guilty and, conversely, that Jaco is more likely to be innocent. As such, the evidence was inadmissible.

### IV.   Constitutionality of Section 557.036

■   The next claim is that the trial court erred in refusing to declare section 557.036 facially unconstitutional and proceeding with a bifurcated trial. Section 557.036.3, as amended in 2003, provides:

If the jury at the first stage of a trial finds the defendant guilty of the submitted offense, the second stage of the trial shall proceed. The issue at the second stage of the trial shall be the punishment to be assessed and declared. Evidence supporting or mitigating punishment may be presented. Such evidence may include, within the discretion of the court, evidence concerning the impact of the crime upon the victim, the victim's

family and others, the nature and circumstances of the offense, and the history and character of the defendant. Rebuttal and surrebuttal evidence may be presented. The state shall be the first to proceed. The court shall instruct the jury as to the range of punishment authorized by statute for each submitted offense. The attorneys may argue the issue of punishment to the jury, and the state shall have the right to open and close the argument. The jury shall assess and declare the punishment as authorized by statute.

Jaco first contends that section 557.036 is invalid because it does not identify a standard of proof for the jury to use in reviewing evidence presented in the penalty phase; rather, it merely requires jurors simply to agree on the punishment they assess. Jaco explains that any fact that warrants a punishment other than the lowest available in the range of punishment must be found beyond a reasonable doubt, citing *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). However, neither of these cases held that a jury is required to find facts beyond a reasonable doubt to impose a sentence that is within the unenhanced range of punishment for an offense. *Ring* and *Apprendi* merely held that facts that are the functional equivalent of elements of offenses, such as a statutory aggravating circumstance that is required for eligibility for the death penalty, must be found beyond a reasonable doubt by a jury. *Ring,* 536 U.S. at 602, 122 S.Ct. 2428; *Apprendi,* 530 U.S. at 482–83, 120 S.Ct. 2348. In the present case, Jaco's 20–year sentence was within the original, unenhanced range of punishment, which was 10 to 30 years or life imprisonment. Therefore, any facts that would have tended to assess her punishment within this range were not re-

quired to be found beyond a reasonable doubt by a jury.

Jaco also argues that section 557.036 is unconstitutional because it fails to require the state to give notice to the defense of penalty phase evidence and witnesses. However, in criminal cases, there is no general right of discovery, and the only disclosure that must be provided to a criminal defendant is that which is required under Rule 25 pertaining to discovery in criminal cases. *State v. Wood,* 719 S.W.2d 756, 759 (Mo. banc 1986). Furthermore, contrary to Jaco's assertion, the Due Process Clause does not mandate disclosure of penalty phase evidence or witnesses. The Due Process Clause merely requires that defendants not be compelled to give disclosure if they are not given reciprocal discovery rights, *Wardius v. Oregon,* 412 U.S. 470, 474–76, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973), and that the state is required to disclose exculpatory evidence that might be material to the outcome of a case, *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Finally, even if there was a due process penalty phase disclosure requirement, in this case, Jaco was not prejudiced because several months before trial the state did in fact endorse as witnesses the four persons who testified in penalty phase.

Next, Jaco maintains that section 557.036 unconstitutionally permits the introduction of character evidence where the defendant has not otherwise injected his or her character into the case during trial. However, Jaco does not explain just how or why that evidence is unconstitutional in a penalty phase setting. In any event, this Court has repeatedly held that both the state and the defendant may introduce any evidence pertaining to the defendant's character in order to help the jury assess punishment in a penalty phase setting, *e.g., State v. Winfield,* 5 S.W.3d 505, 515 (Mo.

banc 1999), even where that evidence constitutes unadjudicated bad acts, *e.g., State v. Ferguson,* 20 S.W.3d 485, 500 (Mo. banc 2000).

Jaco's next claim is that the legislature violated the separation of powers doctrine in enacting section 557.036, which Jaco characterizes as a procedural change in the law, because those matters are preempted by this Court's rules involving the same procedures. When a conflict exists between this Court's rules and a statute, "the rule always prevails if it addresses practice, procedure or pleadings." *State ex rel. Union Elec. Co. v. Barnes,* 893 S.W.2d 804, 805 (Mo. banc 1995). Although this Court has promulgated numerous rules pertaining to the conduct of trials in criminal cases, *see* Rules 27.01–27.09, none of those rules address whether a two-phase trial is permitted in a non-death penalty case. Therefore, section 557.036 is not inconsistent with any of those rules.

Alternatively, and inconsistently, Jaco argues that section 557.036 is not a procedural law but a substantive law that could not be applied retroactively in that her crime occurred before the amendment of section 557.036. "Procedural law prescribes a method of enforcing rights or obtaining redress for their invasion; substantive law creates, defines and regulates rights." *Wilkes v. Mo. Highway and Transp. Comm'n,* 762 S.W.2d 27, 28 (Mo. banc 1988). The distinction is that "substantive law relates to the rights and duties giving rise to the cause of action, while procedural law is the machinery used for carrying on the suit." *Id.* Section 557.036 is clearly a procedural law. Application of this statute was proper.

## V. Jaco's Proffered Instruction

Finally, Jaco alleges that the trial court erred in refusing to submit her non-

MAI Instruction "A," which would have required the jury, among other things, to "find beyond a reasonable doubt that aggravating circumstances exists [sic], taken as a whole, to impose punishment in excess of ten (10) years in the Department of Corrections." Having already rejected her argument that the jury had to find aggravating circumstances beyond a reasonable doubt in order for her to receive more than the minimum sentence, this Court holds that the trial court did not err in refusing to submit this instruction. A decision of a trial court not to submit an incorrect instruction cannot be error. *State v. Parkhurst*, 845 S.W.2d 31, 36–37 (Mo. banc 1992).

## VI. Conclusion

For the foregoing reasons, the judgment is affirmed.

WHITE, C.J., STITH, PRICE, TEITELMAN and RUSSELL, JJ., and BLACKMAR, Sr. J., concur.

WOLFF, J., not participating.