Dennis E. HESS, Appellant–Respondent,

v.

CHASE MANHATTAN BANK, USA, N.A., Respondent–Appellant.

No. SC 87691.

Supreme Court of Missouri, En Banc.

May 1, 2007.

Alok Ahuja, Terry J. Satterlee, William G. Beck, Kurt U. Schaefer, Kansas City, MO, for Appellant-Respondent.

Elizabeth C. Carver, Ann K. Covington, St. Louis, Robert J. Hoffman, Jennifer Donnelli, Kansas City, MO, for Respondent-Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Anne E. Schneider, Asst. Atty. Gen., Mary S. Erickson, Asst. Atty. Gen., Jefferson City, Mo, for Amicus Curiae Missouri Attorney General.

LAURA DENVIR STITH, Judge.

Dennis Hess purchased property in Platte County, Missouri, from Chase Manhattan Bank ("Chase") for $52,000 in April 1999. At the time of the sale, Chase was

aware that the property was being investigated by the United States Environmental Protection Agency ("EPA") in connection with illegal hazardous waste dumping on the property by its prior owner, on whose mortgage Chase had foreclosed. Chase did not disclose the EPA's investigation to Hess. When Hess learned of it after the purchase, he filed suit against Chase alleging common law fraud and a violation of the Missouri Merchandising Practices Act ("MPA").

The trial court granted Chase's motion to dismiss the MPA claim because the MPA was not amended to allow a private right of action for misrepresentation in the sale of real estate until after the date of the sale. Hess appeals that ruling. Hess' fraud claim proceeded to trial. The jury found in Hess' favor and awarded him actual but not punitive damages. Chase cross-appeals the submission of the fraud claim to the jury.

The trial court correctly denied Chase's motion for judgment notwithstanding the verdict on the fraud claim. Because Hess' claim was one for fraudulent inducement to contract, it is not precluded by the inclusion of disclaimers in the contract itself, and Hess presented evidence that the EPA investigation should have been disclosed despite the disclaimers. Further, the trial court erred in dismissing Hess' MPA claim. The MPA has long barred the kind of real estate representations alleged here. The fact that it was not amended until 2000 to permit a private right of action for such misrepresentations, in addition to suit by the attorney general,

is no bar to suit by Hess for actual damages and attorneys' fees. The MPA did not, however, allow recovery of punitive damages at the time of Chase's misrepresentations; therefore, Hess may not recover them. The judgment is affirmed in part and reversed in part, and the case is remanded.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

Chase held a mortgage on a four-acre property in southwestern Platte County ("the property") when it was owned by Billy Stevens (the "mortgagor"). The mortgagor also owned a paint company. Hess presented evidence at trial that, on several occasions, the mortgagor ordered his employees to load a trailer with ten or twelve 55–gallon paint drums and dump them at the property so that he could avoid the costs of proper storage and disposal. He also caused his employees to dump three or four pallets of old paint cans near the foundation of an old barn on the property. In June 1997, former employees of the paint company informed the EPA of this illegal dumping. The mortgagor thereafter filed for bankruptcy protection and defaulted on the mortgage.

In April 1998, the EPA obtained a search warrant and discovered numerous rusty, leaking containers of waste paint and paint-related products. A few months later, in December 1998, the mortgagor pled guilty to federal environmental crimes and was sentenced to serve one year and a day in prison. The next month, Chase, who earlier had initiated foreclosure pro-

---

1. For the assistance of the reader, the votes on the various opinions in this case can be summarized as follows: the entire court concurs with this opinion's resolution of the fraud claim in section II; a majority consisting of the author, Chief Justice Wolff, Judge Teitelman and Special Judge Shaw concurs that recovery of actual damages and attor-

neys' fees under the MPA is permissible as set out in sections III.C.1 and III.C.2; and a majority consisting of the author, Chief Justice Wolff, Judges Russell, Limbaugh and White, and Special Judge Shaw concurs that recovery of punitive damages under the MPA was not permitted at the relevant time as discussed in section III.C.3.

ceedings, purchased the property out of foreclosure. Shortly before doing so, on January 6, 1999, Chase's foreclosure counsel received a telephone call from an EPA attorney regarding the contamination investigation. Chase's foreclosure counsel represented that she would refer the matter to "someone at Chase that handles contaminated properties." On February 18, 1999, Chase informed its foreclosure counsel that it had the contact information for relevant EPA personnel and that Chase would be dealing directly with the EPA regarding the environmental issues. Chase subsequently commissioned an appraisal of the property that was completed on April 5, 1999. The appraisal noted that "the EPA is scheduled to inspect the site and possible [sic] requirements may be made."

Chase then listed the property for public sale. The property generated interest from a number of persons, three of whom, including Hess, ultimately made offers to buy it. At the time of their offers, the other two prospective purchasers had seen the paint cans the previous owner had dumped near the old barn, but Hess had not. None of the three individuals who offered to purchase the property undertook any environmental inspections of the property. The uncontradicted trial testimony of experienced real estate agents was that such inspections would have been extraordinary under the circumstances, as none of the potential purchasers knew the EPA was concerned about the property.

Chase knew that the EPA was investigating the property, but it did not disclose that fact to Hess or to other potential buyers prior to the sale. Hess offered to purchase the property for $52,000, and Chase accepted the offer. Chase asserted in the sale contract that it "had never seen

nor occupied the property" and that it had "not inspected [the] property." The sale contract expressly required Chase to complete a "Seller's Disclosure–Statement of Condition of the Property," which Chase never completed.[2] Hess and the other potential buyers testified that they would not have offered to purchase the property had they known of the EPA investigation.

After the purchase, Hess was cleaning up the property and preparing for renovations when he discovered the paint cans. Not realizing the EPA was concerned about the cans, he hired a construction company to bury the paint cans along with other waste on the property. In January 2000, the EPA issued a unilateral administrative order for Hess to exhume and dispose of the buried paint cans within 10 days.

Hess sued Chase once he learned of the EPA's order and investigation, alleging that Chase had a duty to disclose the EPA investigation prior to the sale and that its failure to do so constituted common law fraud and violated the MPA. The trial court dismissed Hess' MPA claim. After a two-week trial, the jury returned a verdict for Hess on his fraud claim for $52,000 in actual damages but did not award punitive damages. As previously noted, Hess appeals from the dismissal of his MPA claim and Chase cross-appeals from the judgment for actual damages on the fraud claim. After opinion by the Missouri Court of Appeals, Western District, this Court granted transfer. Mo. Const. art. V. sec. 10.

## II. FRAUD CLAIM

### A. Standard of Review.

---

**2.** Count I of Hess' petition stated a claim for breach of contract based on this failure, but Hess voluntarily dismissed this count without prejudice prior to trial.

■ Chase claims that the trial court erroneously denied its motion for a directed verdict and its motion for judgment notwithstanding the verdict because Hess failed to make a submissible case. In evaluating this claim, this Court reviews the evidence "in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict." *Dhyne v. State Farm Fire & Cas. Co.*, 188 S.W.3d 454, 456–57 (Mo. banc 2006); *Jungerman v. City of Raytown*, 925 S.W.2d 202, 204 (Mo. banc 1996).

**B. Required Elements for a Submissible Case of Fraudulent Nondisclosure.**

■ In order to make a submissible case of fraudulent misrepresentation, a plaintiff must prove nine essential elements: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury. *Heberer v. Shell Oil Co.*, 744 S.W.2d 441, 443 (Mo. banc 1988); *see Trimble v. Pracna*, 167 S.W.3d 706, 712–13 (Mo. banc 2005) (reversing denial of JNOV on fraud).

This Court has not recognized a separate tort of fraudulent nondisclosure, such as Hess asserts here. Instead, in such cases, a party's silence in the face of a legal duty to speak replaces the first element: the existence of a representation. *Andes v. Albano*, 853 S.W.2d 936, 943 (Mo. banc 1993). Chase claims that Hess failed to show that it had a duty to disclose and failed to show that Hess had a right to rely on it to make disclosures; thus, Hess failed to make a submissible case on the first and eighth elements of fraud set out above. In support, Chase points to the sale contract, which specified that Chase was making no representations, guaranties, or warranties regarding the property and sold it "as is." As Chase does not dispute the sufficiency of the evidence of the remaining elements of fraud, the Court limits its fraud inquiry to whether there was sufficient evidence of these two disputed elements.

**C. Chase had a Duty to Disclose the EPA's Investigation.**

■ In nondisclosure cases, a party's silence amounts to a representation where the law imposes a duty to speak. *Andes*, 853 S.W.2d at 943. "Whether or not a duty to disclose exists ... must be determined on the facts of the particular case." *Ringstreet Northcrest, Inc. v. Bisanz*, 890 S.W.2d 713, 720 (Mo.App. W.D.1995). A duty to speak arises where one party has superior knowledge or information that is not reasonably available to the other. *Andes*, 853 S.W.2d at 943. "Silence can be an act of fraud where matters are not what they appear to be and the true state of affairs is not discoverable by ordinary diligence." *Bayne v. Jenkins*, 593 S.W.2d 519, 529 (Mo. banc 1980).

■ Similarly, a jury is empowered to find that the buyer has a right to rely on the seller to disclose where the undisclosed material information would not be discoverable through ordinary diligence. *See Groothand v. Schlueter*, 949 S.W.2d 923, 930 (Mo.App. W.D.1997) (buyer may rely on seller where the facts are "peculiarly within the knowledge" of seller and "the truth is difficult for the buyer to ascertain"). Thus, in a case of fraudulent nondisclosure such as Hess alleges here, the analysis of proof of a duty to disclose and of the right to rely collapses into a com-

bined inquiry as to whether Chase had knowledge of undisclosed material information that Hess would not have discovered through ordinary diligence.

■ Hess presented evidence that Chase learned that the EPA was investigating the property before Chase completed its foreclosure of the mortgage and that Chase informed the property appraiser that the EPA was scheduled to inspect the site and it was possible that remediation requirements would be imposed. These facts provided a basis for the jury to find that Chase had superior knowledge of the EPA investigation of the property.

■ Even with superior knowledge, a duty to disclose will be imposed only if the material facts would not be discovered through the exercise of ordinary diligence. *See Bayne,* 593 S.W.2d at 529. Chase asserts that a reasonable inspection of the property by Hess would have disclosed the presence of the paint cans near the old barn foundation. This ignores the fact that what type of investigation was reasonable is by its nature normally a factual inquiry and, thus, a jury question. In any event, Chase's argument misapprehends the factual basis of Hess' fraudulent non-disclosure claim. It is the *EPA investigation* into hazardous waste dumping on the property that is the material fact that Hess asserts Chase had a duty to disclose, not the presence (or absence) of paint cans.

Hess presented evidence that two potential buyers who did discover the paint cans each still made an offer to purchase the property. Both testified that the presence of paint cans did not give them notice that the EPA was investigating and that, had they known of its investigation, they would not have made offers for the property. From this evidence, the jury could have found that even had Hess further inspect-

ed the property and discovered the paint cans, this would not have put him on notice that the EPA had an ongoing investigation into hazardous waste dumping on the property.

Similarly, Hess presented evidence that further precautionary steps to test the groundwater and soil for environmental contamination were well beyond the scope of ordinary diligence in a real estate transaction such as this and that, even had Hess undertaken further tests, he would not have learned of the EPA's ongoing investigation. Since the jury could find that Chase knew of the EPA's investigation and that Hess could not reasonably have discovered it, Chase had a duty to disclose this fact.

*Droz v. Trump,* 965 S.W.2d 436 (Mo. App. W.D.1998), is directly on point. In *Droz,* a prospective buyer of real estate knew that the property had been a landfill but not that the Missouri Department of Natural Resources was investigating contamination on the property and considering whether to place it on Missouri's registry of hazardous waste disposal sites. *Id.* at 439. *Droz* found the failure to disclose the investigation was sufficient to support a claim for fraudulent misrepresentation. *Id.* at 443–44. Similarly here, Chase failed to disclose the EPA investigation to Hess.

■ Chase asserts that in spite of the evidence of its knowledge and Hess' inability to discover the EPA investigation, a duty to disclose should not be imposed because the contract specified that Chase was making "no representations, guaranties, or warranties, either written or implied, regarding the property" and that "the property is being sold in AS–IS condition with no express or implied representations or warranties by the seller or its

agents."[3] It claims that through these provisions, it bargained for the right to remain silent and no duty to speak ever arose.

 What Chase misapprehends is that Hess alleges *fraud in the inducement* to contract, not fraud in the terms of the contract. "Missouri law ... holds that a party may not, by disclaimer or otherwise, contractually exclude liability for fraud in inducing that contract." *Lollar v. A.O. Smith Harvestore Prods., Inc.,* 795 S.W.2d 441, 448 (Mo.App. W.D.1990). Each of the individuals who made an offer to purchase this property did so without knowledge that it was under EPA investigation. They all testified that, had they known, they would not have made an offer to purchase this property and would not, therefore, have "bargained for" Chase's silence. Chase's duty to speak arose from its superior knowledge prior to the execution of this contract. The presence of a clause disclaiming warranties in a contract does not negate a pre-contractual duty to speak. *See Artilla Cove Resort, Inc. v. Hartley,* 72 S.W.3d 291, 299 (Mo.App. S.D. 2002) (holding that real estate contract specifying the seller was making no representations regarding the condition of the property "did not relieve defendants of the duty to disclose" known material facts that were "not ... within the fair and reasonable reach of the [buyers]"); *see also Wagner v. Uffman,* 885 S.W.2d 783, 786 (Mo.

App. E.D.1994) ("A party may not contractually exclude oneself from fraud through the use of general disclaimers.").

Moreover, the fact that the contract required the seller to complete a form disclosing the condition of the property—a form Chase did not fill out—demonstrates that a duty to disclose is not inconsistent with the presence of disclaimers. Indeed, while there was evidence that an "as—is" provision has the twin effects of preventing the buyer from requiring the seller to make or to pay for necessary repairs to the property and of excluding implied warranties (of title, of habitability, etc.), real estate agents testified that even where the sale contract specifies the seller makes no warranties and the property is sold as-is, a seller would be expected to disclose the EPA's involvement.[4]

Finally, the Chase employee responsible for overseeing the sale also testified that, notwithstanding the "as-is" clause in the purchase contract, "anything factual that we know as a certainty should be disclosed. It would be illegal not to disclose that." The following exchange from her testimony further clarifies the issue:

Q: So if you had known that the EPA had investigated the property, you would have made sure that that information was disclosed to Mr. Hess?

A: Yeah.

3. Hess asserts that Chase waived this argument by failing to plead it as an affirmative defense in its answer. This is a legal argument about the import of the terms of a contract that Hess attached to his petition in the first instance, as they affect the elements of duty and reliance. It is not an affirmative defense, and Chase need not have pleaded it as one.

4. The testimony of one real estate agent, with 27 years of experience, was:

Q: If the seller knew that the U.S. EPA was involved with this property ... is that something that you would expect would not be disclosed to you ... by the seller ... because there was an 'as-is' provision in this contract?

A: No, it should have been disclosed to me.

The other real estate agent, with 15 years of experience, testified, "I would expect them to disclose if the EPA were involved ... [i]rregardless [sic] of what their standard form would say."

Yet, the record contains evidence that this very person was specifically informed about the EPA investigation. She had a conversation with Chase's foreclosure counsel regarding the EPA investigation and later received a letter confirming that Chase would be handling the EPA matters directly. She also commissioned the appraisal, which included an acknowledgment that the EPA was scheduled to inspect the site. While the jury could have believed her denials that she had actually read these documents, that was an issue of fact. The jury had sufficient evidence from which to conclude that Chase had knowledge of the EPA investigation and that such knowledge gave rise to a duty to disclose, a duty the jury could and did find was breached.[5]

## III. MPA CLAIM

### A. Standard of Review.

The trial court dismissed Hess' count claiming an MPA violation prior to trial. "A motion to dismiss for failure to state a cause of action is solely a test of the adequacy of the plaintiff's petition. It assumes that all of plaintiff's averments are true, and liberally grants to plaintiff all reasonable inferences therefrom." *Bosch v. St. Louis Healthcare Network*, 41 S.W.3d 462, 464 (Mo. banc 2001). This Court reviews such a dismissal *de novo.*

*Adams v. Union Planters Bank*, 201 S.W.3d 539, 541 (Mo.App. E.D.2006).

### B. MPA Always Prohibited Deceptive Practices in Sales of All Merchandise, Including Goods, Services, and Real Estate.

Section 407.020 has at all times proscribed deceptive or fraudulent acts in connection with the sale of "merchandise," sec. 407.020, RSMo 2000,[6] which the MPA expressly defines to include real estate. Sec. 407.010(4) ("merchandise" includes "any objects, wares, goods, commodities, intangibles, real estate, or services"). At all relevant times, both the attorney general and private parties could sue a seller for alleged use of deceptive practices in the sale of goods and services. Sec. 407.100 (authorizing attorney general to bring enforcement actions); sec. 407.025 (authorizing private suits). Before 2000, though, only the attorney general could bring enforcement actions for deceptive practices in the sale of real estate. Sec. 407.025.1, RSMo 1994; *Detling v. Edelbrock*, 671 S.W.2d 265, 272–73 (Mo. banc 1984) ("The legislature specifically excluded real estate transactions from the scope of the private right of action provision").

In 2000, the private right of action permitted under the MPA was broadened to include all transactions in "merchandise." Sec. 407.025.1. The parties agree that for

---

5. Chase relies heavily on *Ringstreet Northcrest, Inc. v. Bisanz*, 890 S.W.2d 713 (Mo.App. W.D.1995), in arguing that the contract relieved it of the duty to disclose. In *Ringstreet*, the parties had an "as is" contract that relieved the seller of making warranties, representations, or statements regarding the condition of the multi-unit apartment. *Id.* at 722. The sellers informed the buyer prior to the sale that they had experienced a problem with frozen pipes on one occasion. Subsequent to the purchase, the buyer experienced severe problems with pipes freezing and sued the seller for fraud. The court concluded that the notice that the pipes had frozen in the past imposed a duty on the buyer to investigate the extent of the problem, and there was no actionable nondisclosure on these particular facts. *Id.* at 724–25. Moreover, whether pipes have frozen in the past is something that a thorough plumbing inspection could reveal. By contrast, Hess presented testimony that a reasonable inspection would not have revealed the EPA's investigation into this property and that the presence of paint cans did not have this effect.

6. Unless otherwise noted, all subsequent statutory references are to RSMo 2000.

real estate transactions since that time, private citizens injured by MPA violations have a right to act as "private attorneys general" for purposes of enforcing it. *See Stiffelman v. Abrams,* 655 S.W.2d 522, 530 (Mo. banc 1983) (noting that the " 'private attorney general' concept" acknowledges "that government cannot do everything and that some requirements of the Act can best be enforced by those most directly involved").

In this case, the alleged violations occurred during Chase's sale of the property to Hess in 1999, prior to the 2000 amendment of the MPA. The parties disagree whether the 2000 amendment applies to Hess' MPA claim in these circumstances.

## C. The State Constitutional Ban on Retrospective Laws Does Not Bar Retrospective Application of Procedural or Remedial Laws.

■■■ The Missouri Constitution prohibits laws that are retrospective *in operation.* Mo. Const. art. I, sec. 13. A law is retrospective *in operation* if it takes away or impairs vested or substantial rights acquired under existing laws or imposes new obligations, duties, or disabilities with respect to past transactions. *Doe v. Roman Catholic Diocese of Jefferson City,* 862 S.W.2d 338, 340 (Mo. banc 1993).

■■■ Procedural and remedial statutes "not affecting substantive rights, may be applied retrospectively, without violating the constitutional ban on retrospective laws." *Mendelsohn v. State Bd. of Registration for the Healing Arts,* 3 S.W.3d 783, 786 (Mo. banc 1999). "Procedural law prescribes a method of enforcing rights or obtaining redress for their invasion; substantive law creates, defines and regulates rights." *Wilkes v. Mo. Hwy. & Transp. Comm'n,* 762 S.W.2d 27, 28 (Mo. banc

1988). "The distinction is that 'substantive law relates to the rights and duties giving rise to the cause of action, while procedural law is the machinery used for carrying on the suit.' " *State v. Jaco,* 156 S.W.3d 775, 781 (Mo. banc 2005), *quoting Wilkes,* 762 S.W.2d at 28.

■■■ Laws that provide for penalties where none existed before, however, are substantive and "are always given only prospective application." *See Yellow Freight Sys., Inc. v. Mayor's Comm'n on Human Rts.,* 791 S.W.2d 382, 387 (Mo. banc 1990). And, absent legislative intent to the contrary, "[w]hen a statute is ... remedial in one part while penal in another, it should be considered a remedial statute when enforcement of the remedy is sought" and applied retrospectively, but considered "penal when enforcement of the penalty is sought" and applied prospectively. *City of St. Louis v. Carpenter,* 341 S.W.2d 786, 788 (Mo.1961).

■■■ Chase insists that the 2000 amendment to the MPA created a new cause of action and it is unconstitutional to apply it retrospectively. A "cause of action" is "a group of operative facts giving rise to one or more bases for suing." *Chesterfield Village, Inc. v. City of Chesterfield,* 64 S.W.3d 315, 318 (Mo. banc 2002). The operative facts that give rise to Chase's liability are the same both before and after the amendment: the use of a practice that MPA section 407.020 declares unlawful in the sale of real estate.[7] While under the amended statute the class of potential plaintiffs who can sue for violations of the MPA is broader than it was previously, the contours of the obligations imposed on sellers of real estate by section 407.020 are unchanged. Chase was always affirmatively obliged not to employ an un-

---

**7.** The attorney general, acting as a friend of the court, affirmed that he has initiated enforcement actions against sellers of real estate for violations of the MPA.

lawful practice under the MPA in its sale to Hess.

Rather than imposing a new duty on Chase, the amendment as a whole "merely substitute[s] a new or more appropriate remedy for the enforcement of an existing right." *Pierce v. State, Dept. of Social Svcs.*, 969 S.W.2d 814, 823 (Mo.App. W.D. 1998). To the extent it simply "prescribes a method of enforcing rights or obtaining redress for their invasion," *Wilkes*, 762 S.W.2d at 28, it is procedural and can be applied retrospectively. To the extent that it allows an entirely new type of disability, however, it may be considered substantive or penal in nature and must apply only prospectively. Each type of recovery permitted under the act must be analyzed separately.[8]

**1. Actual Damages Are not a Substantive Additional Disability.**

The MPA allows the attorney general to bring suit and seek "restitution .·. as may be necessary to restore to any person who has suffered any ascertainable loss" as a result of violation of the MPA in a real estate transaction. Sec. 407.100.4. Chase argues that these damages are different in kind than the "actual damages" that a private litigant may recover under the 2000 amendment. Restitution is merely a form of actual damage, however, and the MPA itself defines both restitution and actual damages in terms of "ascertainable losses." *Compare* sec. 407.025.1 (allowing actual damages where plaintiff "suffers an ascertainable loss of money or property"), *with* sec. 407.100.4 (allowing restitution to "restore to any person who has suffered any ascertainable loss").

Even assuming for the sake of argument that the dollar amounts recoverable may vary under these two definitions in a particular factual situation, Chase cites no authority that a mere change in how actual damages are measured requires a statute to be applied prospectively only, when the nature of the wrong and the remedy are both remedial and similar in kind. In such a case, a mere change in how damages are measured is no different from a change in the language of how damages are computed under the applicable Missouri approved instructions. The nature of the duty and remedy are still the same. The actual damage remedy under the MPA applies retrospectively.

**2. Recovery of Attorneys' Fees is Not a New Disability and Applies Retrospectively.**

Hess is also entitled to seek recovery of his attorneys' fees. Indeed, recovery of attorneys' fees is nothing new under the MPA. Since 1985, the attorney general has been permitted to collect attorneys' fees under the MPA, just as prevailing private plaintiffs acting as "private attorneys general" in enforcing this and other remedial statutes are permitted to collect their at-

---

8. This Court rejects Chase's corollary argument that if the right to recover any one of these types of damages can only be given prospective effect, then the entire cause of action can be given only a prospective effect even if the remainder of the statute is procedural or remedial in nature. Chase's citations are not to the contrary. *U.S. Life Title Ins. Co. v. Brents*, 676 S.W.2d 839, 841–42 (Mo.App. W.D.1984), determined that a statute addressing residential second mortgages could only be applied prospectively because it was part of a comprehensive scheme that "has woven into its fabric clear evidence of a legislative intent that it be prospective only in its application." *Id.* Here, by contrast, the amendment merely changed who could bring an action for violations of the MPA in regard to real estate transactions. Chase's other case, *State ex rel. Carlund Corp. v. Mauer*, 850 S.W.2d 357, 361 (Mo.App.1993), actually runs counter to Chase's argument; it determined that the punitive subsection of a newly enacted statute should only apply prospectively but the remedial subsections should apply retrospectively. *Id.*

torneys' fees in bringing such actions. *See* sec. 407.130 (permitting the attorney general "to recover as costs, in addition to normal court costs, the cost of the investigation and prosecution of any action to enforce the provisions of this chapter"); sec. 407.025.1 (permitting the court to "award to the prevailing party attorney's fees"); *White v. Mo. Veterinary Medical Bd.*, 906 S.W.2d 753, 756–57 (Mo.App. W.D.1995) (noting that, although the plaintiff was not able to collect fees, fee-shifting is often available where plaintiff acts as "private attorney general").

The 2000 amendment merely allowed private parties to sue for alleged MPA violations in all merchandise transactions, rather than just in regard to goods and services. As noted above, that did not impose a new obligation.

Chase's contention that the statute authorizing the attorney general to collect, "in addition to normal court costs, the cost of investigation and prosecution of any action," does not authorize the attorney general to collect attorneys' fees is plainly erroneous and previously has been rejected. *See State ex rel. Webster v. Areaco Inv. Co.*, 756 S.W.2d 633, 635, 637 (Mo. App. E.D.1988) (section 407.130 "clearly authorizes" trial court to award attorney general attorney's fees in MPA case). While the fees of a private attorney general, such as Hess, may be greater or less than the costs of investigation and prosecution by the attorney general, that does not make this a substantive change in the statute requiring only prospective application. The argument that the right to recover attorneys' fees imposes a new disability under the 2000 amendments is without merit.

**3. Recovery of Punitive Damages is a New Disability and Cannot be Applied Retrospectively.**

A different result obtains in regard to the right to bring a private right of action for punitive damages. "The well-established purpose of punitive damages is to inflict punishment and to serve as an example and a deterrent to similar conduct." *Call v. Heard*, 925 S.W.2d 840, 849 (Mo. banc 1996). In light of Missouri's constitutional prohibition on retrospective laws, "laws providing for penalties and forfeitures are always given only prospective application." *Yellow Freight Sys., Inc.*, 791 S.W.2d at 387 (Mo. banc 1990).

Chase argues that, under the pre-amendment statute, sellers of real estate could be obligated to recompense a private party for her injuries and the attorney general for his attorneys' fees, but they could not be assessed punitive damages. This Court agrees.

Prior to the 2000 amendment, a person who violated the MPA in regard to a real estate transaction was subject to civil penalties of up to $1000 per violation and a small penalty of 10 percent "or such other amount as may be agreed upon by the parties or ordered by the Court." *See* sec. 407.100.4; sec. 407.100.6; Sec. 407.140.3. While these sums are penal in nature, they are not similar in kind to the assessment of punitive damages. "[P]unitive damages are extraordinary and harsh." *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 111 (Mo. banc 1996). The risk of imposition of punitive damages on a seller of real estate for an alleged violation of the MPA is a "new disability" that cannot be applied to causes of action that accrued before the effective date of the amendment. Just as *State ex rel. Webster v. Cornelius*, 729 S.W.2d 60, 66 (Mo.App. E.D.1987), held that the attorney general's right to recover attorneys' fees first allowed by the 1985 amendments could not be applied retrospectively because it "attache[d] a new disability," *id.*, so the pri-

vate right to recover punitive damages for violations of the MPA in real estate transactions imposes a new disability and is applicable prospectively only.

### 4. Federal Authority.

The dissent heavily relies on the Eighth Circuit's decision in *Owner–Operator Independent Drivers Ass'n, Inc. v. New Prime, Inc.*, 339 F.3d 1001, 1006–08 (8th Cir.2003). That decision is neither persuasive nor controlling.[9] This Court finds more persuasive the approach taken by *Owner–Operator Independent Drivers Ass'n, Inc. v. Arctic Express, Inc.*, 270 F.Supp.2d 990, 995–97 (S.D.Ohio 2003), which distinguished the cases relied on in *New Prime* and concluded that the same amendments construed in that case could be applied retroactively under principles of federal statutory interpretation because they "simply shifted the power to bring the Defendants into court from the [government agency] to the owner-operators themselves." Id. at 995.

The reasoning of *Arctic Express* mirrors that of this Court today and is the proper result under Missouri's rules governing retroactive application of the laws. As this Court unanimously held in *Wilkes v. Mo. Hwy & Transp. Comm'n*, 762 S.W.2d 27, 28 (Mo. banc 1988), in giving retroactive effect to a 1986 amendment eliminating Missouri's absolute defense of sovereign immunity from certain tort claims, under Missouri principles of constitutional and statutory interpretation such a change is considered procedural, not substantive. *Id.* at 28. Such is the case in regard to the amendment to the MPA to permit a private party injured by defendant's wrong to sue directly for his damages rather than depend on the attorney general to seek restitution for such harm. An amendment to allow a direct action neither takes away vested rights nor imposes new obligations. The same cannot be said of the new provision for imposition of punitive damages, and for that reason the Court holds that such damages are available only prospectively. The cases cited by the dissent applying federal law interpreting different statutes do not require a contrary result.

### D. The MPA Claim Should be Remanded for Consideration of its Merits.

The final issue is the nature and scope of remand on the MPA claim. Chase argues that if this Court finds that the trial court erred in dismissing Hess' MPA claim, it should remand for a new trial on both liability and damages. Hess argues that the elements necessary to prove his claim under the MPA are subsumed within the facts the jury necessarily found in his favor in finding for him on the fraud claim.

9. Citing *Hughes Aircraft Co. v. United States*, 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997), *New Prime* refused to give retroactive effect to an amendment to a commerce act that allowed suits by private individuals. *Hughes*, however, concerned an amendment to the False Claims Act. Prior to the amendment at issue in *Hughes*, the government's knowledge of the facts underlying the false claim prior to the suit constituted a complete defense to liability for the defendant. The amendment removed that defense and for the first time gave standing to private parties to sue for false claims made by others against the government, even if they were not otherwise involved in or affected by the false claim. *Id.* at 949–50, 117 S.Ct. 1871. In these circumstances, *Hughes* found that the deletion of a complete defense and permission for persons not otherwise harmed to sue should not be applied retroactively under federal rules of statutory interpretation. *New Prime* did not involve either suit by a party unharmed themselves by the alleged wrong for which suit was brought or elimination of a defense; thus, it erred in relying on *Hughes*. In addition, *New Prime* involved principles of federal statutory interpretation, which are not binding on this Court. Perhaps for these reasons, these cases were neither cited nor discussed by the parties.

Therefore, Hess contends the issue of liability is moot and this Court should remand with instructions to enter a directed verdict in his favor on the MPA claim and to hold a trial on his actual damages and attorneys' fees.[10]

In order for liability to be moot on remand, it is essential that the jury at the first trial necessarily decide "each and every fact essential to liability" in their verdict. *Dhyne,* 188 S.W.3d at 456 (submissible case requires evidence of all facts essential to liability). Determining whether the jury found each and every fact essential to liability under the MPA claim in deciding the fraud claim in Hess' favor requires a comparison of the elements of the common law fraud claim submitted in the first trial, set out earlier, with the elements of Hess' MPA claim.

Section 407.025 sets out the elements of a private right of action for MPA violations. It states in relevant part:

Any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a private civil action ...

Sec. 407.025.1. In this case, Hess must prove that he has: (1) purchased real estate; (2) for personal, family, or household purposes; and (3) suffered an ascertainable loss of money or property; (4) as a result of an act declared unlawful by section 407.020. Section 407.020 bars a variety of conduct, including concealment, suppression or omission of any material fact in connection with the sale of merchandise, which includes real estate.

In finding for Hess on his fraud claim against Chase, the jury necessarily found that Hess satisfied the first and third elements just listed. In addition, reviewing the pertinent regulations the attorney general promulgated under the MPA, sec. 407.145, reveals that Hess' proof that Chase committed common law fraud was sufficient to prove the fourth element of Hess' MPA claim: that Chase engaged in unlawful conduct under the MPA when it concealed, suppressed or omitted a "material fact" in connection with the sale. Sec. 407.020.1.[11]

■ MPA regulations define "material fact," in pertinent part, as "any fact which a reasonable consumer would likely consider to be important in making a purchasing decision ...". 15 C.S.R. 60–9.010(1)(C). This definition of material is broader than the materiality requirement of common law fraud. *See Carnahan v. American Family Mut. Ins. Co.,* 723 S.W.2d 612, 615 (Mo.App. E.D.1987) (holding that materiality for fraud purposes requires that "the

**10.** Hess also asks that a hearing be held on the issue of punitive damages under the MPA. Chase argues that since the jury rejected Hess' claim for punitive damages under the fraud count, it would be improper to allow an award of punitive damages under the MPA since the same conduct underlies both counts. This Court need not resolve this issue, as it finds that Hess is not entitled to recover punitive damages under the MPA since the right to such recovery is prospective only.

**11.** In argument in this Court, Hess contended that Chase's contract contained an affirmative misrepresentation in the clause stating that Chase had "neither seen nor occupied the property." There is no need for this Court to address whether this would provide an alternative ground for recovery for affirmative misrepresentation under the MPA. The Court leaves that issue to the trial court and the parties on remand. *Cf.* 15 C.S.R. 60–9.620 (defining deception); 15 C.S.R. 60–9.070 (defining misrepresentation); 15 C.S.R. 60–9.080 (defining material untruths).

ultimate result would not have followed if there had been no representation").

■■■ The regulations under the MPA further define *omission* of a material fact as "any failure by a person to disclose material facts known to him/her, or upon reasonable inquiry would be known to him/her." 15 C.S.R. 60–9.110(3). Again, this imposes a broader duty on sellers than the common law imposes for fraud liability, as a fraud claim requires the seller to have actual knowledge of the material facts. *See State ex rel. PaineWebber, Inc. v. Voorhees*, 891 S.W.2d 126, 128 (Mo. banc 1995) (holding that speaker must have "knowledge of its falsity or ignorance of its truth"). Moreover, a fraud claim requires both proof of reliance and intent to induce reliance; the MPA claim expressly does not. *Compare Voorhees*, 891 S.W.2d at 128 (requiring intent to induce reliance, plaintiffs' reliance and right to rely to prove fraud) *with* 15 C.S.R. 60–9.110(4) ("Reliance and intent that others rely upon such concealment, suppression or omission are not elements of concealment, suppression or omission as used in section 407.020.1").

■■■ Proof of omission or concealment of a material fact under the MPA, therefore, plainly requires less proof than was required to prove the comparable elements of Hess' common law fraud claim. The jury's verdict in Hess' favor on the fraud claim establishes that Chase failed to disclose material facts for purposes of the MPA claim.

There remains one element that was not submitted to the jury that Hess must prove to establish his MPA claim: that he purchased the real estate "primarily for personal, family or household purposes." Sec. 407.025.1. Hess asserts that this element is uncontested, noting that uncontroverted trial testimony establishes that he built a home for his family on the proper-

ty. Because the MPA claim had been dismissed prior to trial, and because the use for which Hess purchased the property was not necessary to prove his fraud claim, Chase had no reason to contest this issue. Chase states in this Court that it disputes the purpose for which the property was purchased and intends to contest the issue on remand.

Because no record has been developed on the one unproven element, this Court cannot resolve whether any controverted facts preclude entry of judgment against Chase on Hess' MPA claim. On remand, following such discovery as may be appropriate on this issue, the trial court may determine whether this issue is truly controverted. If so, then Chase is entitled to a trial on its liability on Hess' MPA claim and on damages, though the parties are bound by law of the case on the three already proven issues. If not, then the parties are entitled to a trial on damages for the MPA violation. *See Scott v. Blue Springs Ford Sales, Inc.*, 176 S.W.3d 140, 143 (Mo. banc 2005).

## IV. CONCLUSION

For the foregoing reasons, the judgment on the MPA claim is reversed, the judgment in all other respects is affirmed, and the case is remanded.

WOLFF, C.J., and SHAW, Sp.J., concur; TEITELMAN, J., concurs in part and dissents in part in separate opinion filed; Limbaugh, J., concurs in part and dissents in part in separate opinion filed; RUSSELL and WHITE, JJ., concur in opinion of LIMBAUGH, J.

Price, J., not participating.

RICHARD B. TEITELMAN, Judge, concurring in part and dissenting in part.

Contrary to the majority opinion, I would hold that the punitive damages pro-

visions in the amended MPA can be applied retroactively because those provisions did not establish new standards of conduct or create new liabilities. In all other respects, I concur in the majority opinion.

I agree with the majority that laws providing for penalties where none existed before are to be given prospective application. However, this case does not involve the imposition of any new penalties for violating a new standard of conduct. Instead, this case involves a new procedural means of obtaining a "more appropriate remedy for the enforcement of an existing right." *Pierce v. State Dept. of Social Services*, 969 S.W.2d 814, 823 (Mo.App. 1998). Consequently, the punitive damages provision in the 2000 amendments does not violate the constitutional prohibition against retrospective laws.

When the conduct at issue in this case occurred, the MPA already prohibited Chase from concealing material facts in a real estate transaction and provided for enforcement action by the Attorney General. The MPA also already provided that when a court found an MPA violation and awarded restitution, "there shall be added" penalties of ten percent "or such other amount as may be agreed by the parties or awarded by the court." Section 407.140.3. This statutory language indicates that Chase, even before the 2000 amendments, was already subject to penalties for its conduct in an amount limited only by the constraints of due process. Such liability is materially indistinguishable from punitive damages liability. Thus, the provision for punitive damage in the 2000 amendments did not alter the pre-existing potential for liability in a meaningful way and, instead, simply expanded the procedural options for enforcing pre-existing standards of conduct among real estate vendors. There is no bar to the retroactive application of a procedural or remedial statute that expands the procedural options for enforcing pre-existing standards of conduct. *Mendelsohn v. State Bd. Of Registration for the Healing Arts*, 3 S.W.3d 783, 786 (Mo. banc 1999). Accordingly, I would allow the retroactive application of the punitive damages provision in the MPA.

STEPHEN N. LIMBAUGH, JR.,
Judge, concurring in part and dissenting in part.

I concur in the majority opinion except to the extent that it allows plaintiffs to bring a private cause of action against Chase under the Merchandising Practices Act. The amendment to that law authorizing a private cause of action is substantive, not procedural, and its application here violates the prohibition against retrospective laws under article I, section 13, of the Missouri Constitution.

"A retrospective law takes away or impairs vested or substantial rights acquired under existing laws, or imposes new obligations, duties, or disabilities with respect to past transactions." *Mendelsohn v. State Bd. of Registration for the Healing Arts*, 3 S.W.3d 783, 785–86 (Mo. banc 1999). "Substantive laws—those relating to rights and duties that give rise to a cause of action—may not apply retrospectively." *Id.* at 786. On the other hand, procedural and remedial statutes "not affecting substantive rights, may be applied retrospectively, without violating the constitutional ban on retrospective laws." *Id.* "Procedural law prescribes a method of enforcing rights or obtaining redress for their invasion; substantive law creates, defines and regulates rights." *Wilkes v. Mo. Hwy. & Transp. Comm'n*, 762 S.W.2d 27, 28 (Mo. banc 1988). The distinction is that "substantive law relates to the rights and duties giving rise to the cause of action,

while procedural law is the machinery used for carrying on the suit." *Id.*

Under the MPA, there are certain obligations and duties owed by sellers of real estate to buyers of real estate, and it follows that buyers have a corresponding substantive right to sellers' fulfillment of those obligations and duties. Before the amendment, however, buyers had no private cause of action to enforce that right. The corollary is that at least before the amendment, if not after, sellers had a substantive right not to be subjected to such a private cause of action.

The majority maintains that although there was no private cause of action, the creation of a private cause of action did not "impose new obligations, duties or disabilities with respect to past transactions." According to the majority, those obligations, duties or disabilities were already mandated by the MPA, and defendants were subject to those same provisions both before and after the amendment. The majority thus holds that the private cause of action is not a new cause of action and that the amendment was merely a procedural mechanism to allow private parties to enforce preexisting substantive rights.

Logically, however, the very right of a party to bring a cause of action is no less substantive than the substantive rights the party seeks to enforce, and it is no less an integral part of the cause of action. In other words, substantive rights encompass not only what the majority calls the "operative facts that give rise to [defendant's] liability"—the defendant's violation of the obligations and duties imposed by the statute—but also the right or standing of a party to enforce those rights. In the simplest terms, then, one cannot divorce a cause of action from who may bring a cause of action. In contrast, the right to bring a cause of action is not a procedural right because it does not pertain to the "machinery used for carrying on the suit"—it is instead the right to use that machinery. Because the right to bring a cause of action is a part of the substantive cause of action itself, it cannot be applied retrospectively. Unfortunately, this is so fundamental a notion that it goes without saying, and our Missouri opinions have not addressed it, not that they have ever held to the contrary.

The federal courts, however, have addressed this issue head-on. The recent 8th Circuit opinion in *Owner–Operator Independent Drivers Association, Inc. v. New Prime, Inc.*, 339 F.3d 1001 (8th Cir. 2003), for example, is directly on point and directly in conflict with the majority in this case. *New Prime* holds expressly that expanding the class of plaintiffs who can bring suit to enforce a preexisting statutory cause of action creates a new cause of action that results in an impermissible retroactive application of the statute. *Id.* at 1007. Like the case at hand, *New Prime* involved a statutory regulatory scheme enforceable solely by government action and an amendment to the statute permitting a private cause of action. In particular, the regulatory scheme in *New Prime* was a provision of the Interstate Commerce Commission Termination Act under which only the Interstate Commerce Commission could bring a cause of action against motor carriers for their failure to comply with Truth–In–Leasing regulations. *Id.* at 1006–07. The amendment to the Act, however, also authorized individual owner-operators to commence private causes of action. *Id.* In arriving at the holding, the court in *New Prime* first set out the federal standard (substantively the same as the Missouri counterpart) for determining whether a statute has impermissible retroactive effect, which is "whether it would impair rights a party possessed when he acted, increase a party's liability for past

conduct, or impose new duties with respect to transactions already completed." *Id.,* citing *Landgraf v. USI Film Prods.,* 511 U.S. 244, 280, 114 S.Ct. 1522, 128 L.Ed.2d 229 (1994). The Court's analysis then proceeded as follows:

Prior to the ICCTA, only the ICC could bring claims against motor carriers for failure to comply with the applicable regulations. The ICCTA shifts this power and permits individual Owner–Operators to bring defendants directly into court. We find that this creates an impermissible retroactive effect.

This issue is analogous to the issue presented in *Hughes Aircraft Co. v. United States,* 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997), in which the Supreme Court held that when a statute expanded the class of plaintiffs who could bring claims, the statute altered the defendant's substantive rights and therefore had a retroactive effect. *Id.* at 950, 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135) ("In permitting actions by an expanded universe of plaintiffs with different incentives, the [new statute] essentially creates a new cause of action, not just an increased likelihood that an existing cause of action will be pursued.") (citation omitted). Here, by permitting Owner–Operators to bring their own actions against motor carriers, the ICCTA expands the class of plaintiffs who could bring claims, thereby altering the motor carriers' substantive rights....

The *Hughes* Court also noted that individual plaintiffs will be motivated "primarily by prospects of monetary reward rather than the public good." 520 U.S. at 949, 117 S.Ct. 1871. We find this to be the case here as well: Owner–Operators who sue motor carriers will likely be motivated by their own potential financial gain. This increases defendant motor carriers' potential liability, thereby creating a retroactive effect.

*Id.* at 1007. Just as in *New Prime,* the private cause of action in this case is a new cause of action that alters the defendant's substantive right to be free from suit by private parties, increases defendant's potential liability, and thereby creates an impermissible retroactive effect.

The majority disparages *New Prime's* reliance on the Supreme Court precedent in *Hughes Aircraft,* a case in which the Court refused to give retroactive effect to an amendment to the False Claims Act that allowed suits by private individuals. According to the majority, "*New Prime* did not involve either suit by a party unharmed themselves [the parties bringing suit were *qui tam* plaintiffs], or elimination of the defense [the government's knowledge of the facts underlying the false claim], and thus erred in relying on *Hughes.*" However, the fact that the *qui tam* plaintiffs in *Hughes Aircraft* were unharmed themselves (their claim for damages is essentially a reward for their whistle blowing efforts) is irrelevant, because the defendants were nonetheless exposed to the potential for increased liability from new suits by that new class of plaintiffs. Furthermore, the fact that *Hughes Aircraft* involved the elimination of a statutory defense is also irrelevant, because, as the *New Prime* court implicitly recognized, the presence of a new class of plaintiffs is couched as an independently sufficient ground for its holding. The Supreme Court's bottom line on this issue bears mention again: "In permitting actions by an expanded universe of plaintiffs with different incentives, the [amendment] essentially creates a new cause of action, not just an increased likelihood that an existing cause of action will be pursued." *Hughes Aircraft,* 520 U.S. at 950, 117 S.Ct. 1871.

The majority makes the same mistake in relying on the district court opinion in *Owner–Operator Independent Drivers*

*Ass'n, Inc. v. Arctic Express, Inc.*, 270 F.Supp.2d 990 (S.D.Ohio 2003). *Arctic Express* is cited for the proposition that the provision for a new class of plaintiffs does not violate the ban against retrospective laws because it "simply shifted the power to bring the Defendants into court from the [government agency] to the owner-operators themselves." Not so. The provision for separate suits by a new class of plaintiffs increased the defendant's potential liability by subjecting them to suit from both the government and the new class of plaintiffs. As *Hughes Aircraft* instructs, the increased potential liability results from the fact that these new plaintiffs, unlike government plaintiffs, will be motivated "primarily by prospects of monetary reward rather than the public good." *Id.* at 949. And indeed, the motivation of these new plaintiffs, who suffered actual harm, will be even greater than the *qui tam* plaintiffs in *Hughes Aircraft*, who suffered no harm.

Finally, *Wilkes v. Mo. Hwy. & Transp. Comm'n*, 762 S.W.2d 27 (Mo. banc 1988), is inapposite. *Wilkes* holds that "[a]n act abrogating sovereign immunity does not create a new cause of action but provides a remedy for a cause of action already existing for which redress could not be had because of the immunity." *Id.* at 28. The plaintiffs in *Wilkes*, in other words, had an "already existing" private cause of action that they could have pursued but for sovereign immunity or some other defense. But the plaintiffs here had no "already existing" private cause of action, and they could not have brought suit regardless of sovereign immunity or any other defense.

For the foregoing reasons, I would disallow the private cause of action and affirm the trial court's dismissal of that claim.