

# In the Missouri Court of Appeals
# Eastern District

<u>DIVISION TWO</u>

| | | |
|---|---|---|
| S.A.B., | ) | No. ED111235 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| v. | ) | 21SL-PN03826-01 |
| | ) | |
| J.L.R., | ) | Honorable Margaret T. Donnelly |
| | ) | |
| Appellant. | ) | Filed: September 19, 2023 |

Before Michael E. Gardner, P.J., Robert M. Clayton, III, J., and Renée Hardin-Tammons, J.

PER CURIAM

J.L.R. appeals the trial court's judgment of full order of protection entered against him pursuant to the Missouri Adult Abuse Act ("MAAA"), sections 455.010 to 455.085,[1] arguing both that there was insufficient evidence to prove stalking and that the trial court incorrectly applied the amended protective order statute to his conduct. We affirm.

**Factual and Procedural Background**

On February 27, 2019, J.L.R. was discharged from an emergency medical fellowship program at a local hospital. S.A.B. was the program supervisor. S.A.B. testified that there were numerous meetings with J.L.R. regarding disciplinary issues. While S.A.B. could not recall any

---

[1] All statutory references are to RSMo 2021 unless otherwise indicated.

1

specific threats, she testified that J.L.R. "expressed his profound unhappiness" and made it "very clear that he was very unhappy with me." Despite the lack of any specific threats, S.A.B. testified she recalled feeling "very unsafe after several of those encounters," because J.L.R. blamed her for his discharge from the program. S.A.B.'s concerns were amplified because she knew J.L.R. had not returned a bulletproof vest and knife that had been issued to him as a participant in the program, and because J.L.R. knew where S.A.B. lived.

After February 27, 2019, S.A.B and J.L.R. had no direct contact, however S.A.B. responded to employment verification requests from J.L.R.'s prospective employers and disclosed the fact he had been discharged from the program due to character and professional behavior issues.

On August 28, 2021, the police went to S.A.B.'s home and informed her there had been a threat made against her and asked her to contact J.L.R.'s therapist for additional information. J.L.R.'s therapist informed S.A.B. of J.L.R.'s threat on her life but did not provide more specific details at that time. S.A.B. immediately packed her belongings and went to the police department to file an *ex parte* order of protection. S.A.B. notified her employer and co-workers of the situation, obtained a "burner" phone, withdrew cash, removed all social media accounts, purchased two additional firearms, and "basically disappeared" for six weeks to avoid J.L.R.

Approximately ten days after S.A.B. was informed of J.L.R.'s threats, the police provided her with a series of text messages that J.L.R. had sent to his therapist containing the death threat to S.A.B. J.L.R. had sent the text messages from New York, just after midnight E.S.T. on August 28, 2021. Because New York is in the Eastern time zone, J.L.R.'s therapist received the text messages in Missouri between 11:22 p.m. and 11:30 p.m. on August 27, 2021. S.A.B. introduced J.L.R.'s text messages as Exhibit 1. The text messages are reproduced below.

2

J.L.R.: I'm not happy with the world or my place in the world, and I want to handle this on my own terms

J.L.R.: Not tomorrow, not next week, not next month, but when I'm ready

J.L.R.: The biggest thing stopping me is [S.A.B]

J.L.R.: I don't want to take her with me, but I want to make her suffer

J.L.R.: I don't want her to die unless its by her own hands, but want to make her suffer

J.L.R.: My plan is to inject a paralytic agent into her veins, the same paralytic agent she fired me for using on a patient.

J.L.R.: And then remove both of her eyes, her tongue and all 4 limbs, being careful to keep her alive and prevent her from bleeding out

J.L.R.: I want her to live, but I want her to wish I killed her

J.L.R.: I would never harm anyone with a gun including myself, that's far too easy

J.L.R.: I don't need easy, I need righteous

J.L.R.: Good night, I'm going to try and sleep, like I do every night

J.L.R.: You can report me, look me up [sic], whatever you like, but you will never stop me. This isn't a phase or something that will pass, it will happen, the only question is when, and the only answer is no one knows

On July 21, 2022, the trial court conducted a hearing with both parties present and entered a full order of protection in favor of S.A.B. and against J.L.R., effective until July 15, 2027. J.L.R. appeals.

## Standard of Review

This Court will affirm a judgment granting a full order of protection "unless there is no evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies

3

the law." *L.M.M. v. J.L.G.*, 619 S.W.3d 593, 596 (Mo. App. E.D. 2021). This Court views the evidence and the reasonable inferences therefrom in the light most favorable to the verdict. *Davis v. Davis*, 107 S.W.2d 425, 429 (Mo. App. E.D. 2003). "Because the trial judge is in the best position to gauge the credibility of the witnesses, in cases under the Adult Abuse Act, the discretion of the trial court should not often be superseded." *Id.* (internal quotation omitted). Given the "potential stigma that may attach to an individual who is labeled a 'stalker' under the Missouri Adult Abuse Act, trial courts must exercise great care…to ensure sufficient evidence exists to support all elements of the statute before entering a full order of protection." *M.L.G. v. R.W.*, 406 S.W.3d 115, 117 (Mo. App. E.D. 2013).

## Discussion

J.L.R.'s first point on appeal contends that the circuit court erred in granting a full order of protection based on stalking because there was insufficient evidence that J.L.R. purposely engaged in an unwanted course of conduct that caused S.A.B. to reasonably fear physical harm. We disagree and find that all of the elements of stalking within the meaning of the statute were met.

In his second point on appeal, J.L.R. contends that the circuit court erred in applying the amended protective order statute in violation of the ban on retrospective laws contained in Article I § 13 of the Missouri Constitution, thus allowing the protective order to stand for five years rather than the previous statutory maximum of one year. We disagree and find that the circuit court correctly applied the amended statute.

### *Point I: Sufficiency of the Evidence*

J.L.R. argues that there was insufficient evidence to find he engaged in an unwanted course of conduct to constitute stalking. Specifically, J.L.R. claims that the evidence shows only one act—namely the August 28 text messages—that was sufficient to cause alarm to S.A.B.

4

Section 455.020.1 provides, "[a]ny person ... who has been the victim of stalking ... may seek relief under sections 455.010 to 455.085 by filing a verified petition alleging such ... stalking ... by the respondent."[2] As relevant to this case, section 455.010(15) provides that "[s]talking" occurs when "any person purposely engages in an unwanted course of conduct that causes alarm to another person[.]" "The petitioner has the burden of proof under the statute to establish the allegations by a preponderance of the evidence." *R.K. v. Kelly*, 630 S.W.3d 904, 908–09 (Mo. App. W.D. 2021).

A "course of conduct" is "two or more acts that serve no legitimate purpose including, but not limited to, acts in which the stalker directly, indirectly, or through a third party follows, monitors, observes, surveils, threatens, or communicates to a person by any action, method, or device." Section 455.010(15)(b). Critically, "it is the entire course of conduct—not each individual act in isolation—that must reasonably alarm the petitioner." *B.L.M. v. D.L.O.*, 643 S.W.3d 910, 916 (Mo. App. E.D. 2022).

To "alarm" someone means to "cause fear of danger of physical harm." Section 455.010(15)(a). "Alarm has both a subjective and objective component, meaning that a person must subjectively fear the danger of physical harm *and* a reasonable person in the situation would likewise fear the danger of physical harm." *L.M.M.*, 619 S.W.3d at 596 (emphasis in original).

Here, the trial court determined that sufficient evidence existed to establish a course of conduct with respect to the stalking statute. The August text messages were not a standalone event, but rather the culmination of an unwanted course of conduct causing alarm in S.A.B. sufficient to warrant the issuance of the protective order. The record adequately illustrates the entire course of

---

[2] Because Petitioner and Respondent are neither family members nor members of the same household, "[an] allegation of stalking is the only ground upon which an order of protection may be sought under the Adult Abuse Act." *M.L.G.*, 406 S.W.3d at 116 n.3.

conduct, including S.A.B.'s allegations of "numerous meetings where [J.L.R.] expressed to [S.A.B.] profound unhappiness with the process…and with [S.A.B.]," leaving S.A.B. feeling "very unsafe" and convinced that "[J.L.R.] held [her] responsible," and finishing with references to the text messages.

J.L.R. argues that the interactions between him and S.A.B. prior to the August text messages served a legitimate employment purpose and that the text messages themselves served a legitimate purpose because they were "sent by J.L.R. [to his therapist] as the result of waking from a dream/nightmare." We disagree.

Under the MAAA, "an activity with a legitimate purpose is one that is sanctioned by law or custom or is lawful or is allowed." *C.B. v. Buchheit*, 254 S.W.3d 210, 212 (Mo. App. E.D. 2008). J.L.R. did not convince the trial court that his actions and/or words during his pre-termination counseling sessions with S.A.B. were justified under law. While the trial court did not articulate an explicit finding with respect to each of J.L.R.'s actions, "we presume that the trial court made findings in accordance with the decree entered and we may affirm the judgment under any reasonable theory supported by the evidence." *B.L.M.*, 643 S.W.3d at 915 (citing *Uelk v. Directory Distrib. Assocs., Inc.*, 803 S.W.2d 632, 634 (Mo. App. E.D. 1991)).

In a like manner, threats to "remove both of her eyes, her tongue and all 4 limbs, being careful to keep her alive and prevent her from bleeding out" were equally unconvincing to a finding that such a statement serves a legitimate purpose. J.L.R.'s final text in the series (**"You can report me, look me up [sic], whatever you like, but you will never stop me. This isn't a phase or something that will pass, it will happen, the only question is when, and the only answer is no one knows"**) forecloses J.L.R.'s line of reasoning. (Emphasis added). Because the evidence

6

supports a finding that J.L.R. lacked a legitimate purpose in making S.A.B. uncomfortable and afraid in the counseling sessions, J.L.R.'s arguments otherwise are unavailing.

Finally, the evidence supports a finding that S.A.B. was subjectively alarmed by J.L.R.'s conduct, and a reasonable person in S.A.B.'s position would likewise have been in fear of physical harm. Upon learning that an aggrieved, terminated subordinate—who knew where she lived—had issued a death threat targeting her, S.A.B. purchased firearms, deactivated her social media accounts, moved residences, filed for an *ex parte* order of protection, and virtually "disappeared off the face of the earth for six weeks." These actions clearly satisfy the subjective alarm element of the stalking statute, far exceeding the "level of uneasiness, nervousness, unhappiness or the like which are commonly experienced in day to day living." *Overstreet v. Kixmiller*, 120 S.W.3d 257, 259 (Mo. App. E.D. 2003).

Further, S.A.B.'s alarm was objectively reasonable given the specificity of the threat, her history with J.L.R., and the fact that J.L.R.'s therapist saw fit to report the threats to the police. The evidence here, including the inferences therefrom, viewed in a light most favorable to the trial court's judgment, constituted substantial evidence that J.L.R. engaged in a course of conduct that served no legitimate purpose and actually caused alarm to S.A.B. in a manner that would have caused alarm to a reasonable person.

As such, the trial court did not commit reversible error in considering the course of conduct in its entirety and concluding that S.A.B. had satisfied the subjective and objective alarm prongs of the statutory definition of stalking. A court must only find that the entire course of conduct caused subjective and objective alarm. *B.L.M.*, 643 S.W.3d at 916.

The trial court neither erred nor abused its discretion in finding sufficient evidence of stalking to enter a full order of protection judgment.

For these reasons, Point I is denied.

*Point II: Article I, Section 13 of the Missouri Constitution*

J.L.R. claims that the trial court erred by retroactively applying the amended version of the MAAA, effective August 28, 2021, in violation of the Missouri Constitution's Art. 1, § 13 ban on *ex post facto* laws. Specifically, J.L.R. argues that because the text messages were received in St. Louis on August 27 according to Central Standard Time, the older statute should have applied to his conduct.

Because J.L.R. did not properly preserve this constitutional claim for appellate review, the Missouri Supreme Court does not have exclusive appellate jurisdiction.[3] Constitutional objections must be made at the first opportunity to be preserved for appellate review. *State v. Pierce*, 433 S.W.3d 424, 429 (Mo. banc 2014). "If not raised at the first opportunity in the circuit court, a constitutional claim is waived and cannot be raised here." *Id*. As such, to qualify for appellate review of his constitutional claim, J.L.R. must have raised a constitutional objection no later than that part of the full hearing where opposing counsel posits that, "As [J.L.R.] testified, it was, in fact, [J.L.R.'s] local time on August 28th, which would put him under the current statute as opposed to the previous statute." J.L.R. did not object, thus waiving the claim.

Nevertheless, Missouri Supreme Court Rule 84.13(c) allows this Court to review "plain errors affecting substantial rights, in the discretion of the court, though not preserved, when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Rule 84.13(c). To qualify for discretionary review, an aggrieved appellant must allege manifest injustice; "mere

---

[3] This Court has jurisdiction to hear J.L.R.'s second point on appeal pursuant to an exception to the exclusive appellate jurisdiction of the Missouri Supreme Court over constitutional claims contained in Art. V, § 3 of the Missouri Constitution. The Missouri Supreme Court has exclusive appellate jurisdiction only over preserved, substantial, and real—not merely colorable—constitutional claims; a mere assertion that a statute is unconstitutional does not deprive this Court of jurisdiction. *Glass v. First Nat'l Bank of St. Louis, N.A.*, 186 S.W.3d 766, 766 (Mo. banc 2005) (citing *Rodriguez v. Suzuki Motor Corp.*, 996 S.W.2d 47, 51 (Mo. banc 1999)).

prejudice is insufficient to justify plain error review." *Matter of D.N.*, 598 S.W.3d 108, 118 (Mo. banc 2020). Here, J.L.R. failed to allege manifest injustice, claiming instead that the alleged error "is imposing a significant additional burden/damage on [J.L.R.]." Because J.L.R. failed to preserve this issue for appellate review and failed to allege the manifest injustice required for plain error review, this Court need not review J.L.R.'s claim of error.

Even if J.L.R.'s allegation of "significant additional burden/damage" were interpreted as a claim of manifest injustice, thus allowing this Court to exercise discretionary review, J.L.R. would still not be entitled to relief under two independently sufficient theories. First, the amendment to the statute was procedural, not substantive. Second, the trial court properly applied the amended statute to his conduct.

Assuming, *arguendo*, that the older statute was applicable to J.L.R.'s conduct, the trial court did not violate the prohibition against *ex post facto* laws in applying the updated two to ten-year protective order durational limitation—instead of the 180-day to one-year limitation provided for by the older statute—because this amendment was procedural, rather than substantive.

The United States and Missouri constitutions prohibit the enactment of *ex post facto* laws. *R.W. v. Sanders*, 168 S.W.3d 65, 68 (Mo. banc 2005). A constitutionally prohibited *ex post facto* law is one that "provides for punishment for an act that was not punishable when it was committed or that imposes an additional punishment than that in effect at the time the act was committed." *Id*. (quoting *Cooper v. Mo. Bd. of Prob. & Parole*, 886 S.W.2d 135, 137-38 (Mo. banc 1993)). Because this Court is exercising discretion to review this unpreserved constitutional claim, plain error applies.

There are two common exceptions to the ban on *ex post facto* laws: first, where the new law is only procedural, rather than substantive; and second, where the legislature clearly manifests

9

an intent that the statute in question be applied retroactively.[4] *Schwiegert v. Braxton*, 902 S.W.2d 370, 372 (Mo. App. E.D. 1995) (citing *Brennecka v. Dir. of Revenue*, 855 S.W.2d 509, 511 (Mo. App. W.D. 1993)). Because the legislature did not clearly manifest an intent that the statute in question be applied retroactively, we will only discuss the first exception.

The change to the MAAA protective order durational limitation is procedural.

A statute is substantive if it defines the rights and duties giving rise to the cause of action. It is procedural if it prescribes the method of enforcing rights and carrying on the suit. Substantive statutes take away or impair vested rights acquired under existing law, or create a new obligation or impose a new duty.

*Gershman Inv. Corp. v. Duckett Creek Sewer Dist.*, 851 S.W.2d 765, 767 (Mo. App. E.D. 1993) (citing *Wilkes v. Mo. Highway and Transp. Comm'n*, 762 S.W.2d 27, 28 (Mo. banc 1988) and *Danaher v. Smith*, 666 S.W.2d 452, 455 (Mo. App. W.D. 1984)). The change from a maximum of one year to a maximum of ten years did not create a new duty for J.L.R. and did not impair any vested rights of his; rather, the amendment altered the method of enforcing S.A.B.'s rights against him by extending the period in which those rights could be enforced. In other words, "[r]ather than imposing a new duty on [J.L.R.], the amendment as a whole merely substitute[d] a new or more appropriate remedy for the enforcement of an existing right." *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 770 (Mo. banc 2007) (internal quotations omitted) (citing *Pierce v. State, Dep't of Soc. Servs.*, 969 S.W.2d 814, 823 (Mo. App. W.D. 1998)).

J.L.R. had no vested rights with respect to the order of protection law in effect at the time of his actions because the law was changed prior to the issuance and expiration of the order of protection against him; only once the order expires does the right to be free from it vest. *See Doe v. Roman Cath. Diocese of Jefferson City*, 862 S.W.2d 338, 341 (Mo. banc 1993) (holding that

---

[4] There is a third, less common exception: when the legislature waives a vested right of the state. *Hagely v. Board of Educ.*, 841 S.W.2d 663, 667 (Mo. banc 1992).

when revised statutes of limitation are enacted prior to the expiration of the statute of limitations in effect at the time the offenses were committed, the defendants had no vested rights with respect to the original statutes of limitation because the requisite time period had not yet run).

"There is an *ex post facto* violation when a defendant is sentenced under the [Sentencing] Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense." *Peugh v. U.S.*, 569 U.S. 530, 533 (2013). However, this holding is inapplicable here because J.L.R. was not sentenced for committing any criminal act, nor was he punished criminally. *See State ex rel. Williams v. Marsh*, 626 S.W.2d 233, 235 (Mo. banc 1982) (holding that under the Adult Abuse Act no misdemeanor can occur until a protection order is issued, as this is not analogous to defining a crime); *see also C.H. v. Wolfe*, 302 S.W.3d 702, 706 (Mo. App. W.D. 2009) ("An order of protection is not entered pursuant to any criminal statute.") (internal citations omitted).

Thus, because the change to the MAAA durational limitation did not impair any vested rights of J.L.R. and did not impose upon him any new duties, rather substituting a "new or more appropriate" remedy for the enforcement of an existing right, the amendment was procedural, and its retroactive application to J.L.R. did not violate the constitutional ban on *ex post facto* laws. *See Hess*, 220 S.W.3d at 770.

Likewise, J.L.R.'s claim that the amended statute did not apply to his conduct because the amended statute was not yet in effect in Missouri is unpersuasive. It is uncontroverted that the statute went into effect on August 28. Despite the fact that J.L.R.'s therapist received the text messages in St. Louis when it was still August 27 in Missouri, J.L.R. sent the messages from New York, where it was already August 28; thus, the inculpatory conduct occurred on August 28.

11

There is scant authority on whether litigants are bound by a statute in effect in the jurisdiction in which they commit the act in question ("the foreign jurisdiction") but not yet in effect in the jurisdiction from which the statute originates ("the host jurisdiction"); this is an issue of first impression for Missouri.

Persuasive authority holds that the statute comes into effect in the foreign jurisdiction when the foreign jurisdiction reaches the stated date, even if the host jurisdiction has not yet reached that date because of a time difference. *See Sunday v. Madigan*, 301 F.2d 871 (9th Cir. 1962) (relying in part on *Regina v. Logan*, 2 Q.B. 1957, to reason that "persons resident in each [time] zone can most readily determine the effective time of a statute, if fixed in terms of the time in that zone"). Thus, because it was already August 28 in New York City when J.L.R. sent the texts therefrom, the trial court did not err in applying the amended statute to his actions.[5]

For these reasons, Point II is denied.

## Conclusion

The circuit court's judgment is affirmed.

PER CURIAM.

---

[5] This Court expressly declines to rule on whether statutes immediately go into effect in time zones behind Missouri once Missouri reaches the requisite effective date.